## UNITED·STATES v. ROSENSTEIN et al.*

Circuit Court of Appeals, Second Circuit.
July 3, 1929.

No. 375.

Slade & Slade, of New York City (Maxwell Slade, David H. Slade, Leo H. Klugherz, and Sol Feinberg, all of New York City, of counsel), for appellants Rosenstein, Marcus, and Levy.

*Certiorari denied 50 S. Ct. 33, 74 L. Ed. ——.

David P. Siegel, of New York City (Leo H. Klugherz and Irving Davis, both of New York City, of counsel), for appellant Gleit.

Kopp, Markewich & Null, of New York City (Harry Kopp, of New York City, of counsel), for appellant Palmer.

Charles H. Tuttle, U. S. Atty., of New York City (Henry Gerson, Asst. U. S. Atty., and Seymour D. Altmark, Sp. Asst. U. S. Atty., both of New York City, of counsel), for the United States.

Before MANTON, SWAN, and AUGUSTUS HAND, Circuit Judges.

MANTON, Circuit Judge. The indictment charges in the first count, a violation of section 37 of the United States Criminal Code (18 USCA § 88) and section 29b of the National Bankruptcy Act as amended (11 USCA § 52), charging the appellants, together with eight other defendants, with conspiracy to violate section 29b of the National Bankruptcy Act as amended, in that they conspired to conceal assets from the receiver and ancillary receiver of an estate in bankruptcy of one Weinberg, trading as the Star Furniture & Carpet Company. The second count charged the same defendants with aiding and abetting Weinberg in concealing his assets. The third count charged conspiracy to conceal assets of the same bankrupt from the trustee, and the fourth count with aiding and abetting in concealing assets from the trustee in bankruptcy. Weinberg was not apprehended; Goldman was not tried. Four of the defendants pleaded guilty and testified against the others. One defendant was acquitted, and the indictment dismissed against another. The jury found Rosenstein guilty of all four counts, Marcus guilty on the first and second counts, Palmer guilty on the second count, Levy on the first and second counts, and Gleit guilty on the second count.

Weinberg, who was trading under the name of the Star Furniture & Carpet Company, became a bankrupt on November 18, 1927. A receiver was appointed in the Eastern District of New York, and on November 29, 1927, the same receiver was appointed ancillary receiver in the Southern District of New York. A trustee was later elected. The evidence submitted to the jury was sufficient to justify a finding that a conspiracy to conceal assets from the officers of the court, who had charge of the property of the bankrupt, was established. In August, 1927, appellant Rosenstein suggested to one Greenberg, who became a witness for the government, that he run a "racket," and a "racket" is described by Greenberg as "a place of business that is purchased expressly for the purpose of going into bankruptcy, buying a lot of merchandise, selling as best we can, and getting the best price we can for it, and not paying anybody any money for the goods." Good reputation of a concern which is well rated is a necessary prerequisite to its purchase, so that a bankruptcy fraud of this type may be carried out. Rosenstein found an advertisement in a daily paper for the sale of the Star Furniture & Carpet Company, then being conducted in Staten Island. Thereupon he negotiated with the various defendants to obtain the money for its purchase and operation. A so-called "front door" man, who is described as a person of passable character and reputation, in whose name the business would be conducted, is also a prerequisite to carry out the fraud. Weinberg was induced to enter the conspiracy for this purpose. It was arranged that he have a salary of $100 a week and 25 per cent. of the profits. The plan was that he keep in touch with Greenberg by meeting him at Rosenstein's place of business in the morning. Weinberg was instructed to call at the Star Furniture & Carpet Company to ascertain the price. He did so, learned the particulars, returned to Rosenstein, and thereupon plans were made for obtaining the money to purchase the business, for which $10,000 was asked. Attempts were made to reduce the price; Greenberg did not have the money, but informed Rosenstein that he would get in touch with the defendant Fox, who could raise the money, and this was agreeable to Rosenstein. Various meetings were held, discussing the proposition. Rosenstein, Fox, and Greenberg planned the purchase of the business and regarded it as good for their purposes, as it had a rating of $20,000 to $35,000 by a commercial agency. It was planned that Weinberg, Greenberg, Fox, and the man who ultimately furnished the money should each have 25 per cent. of the profits, and that Rosenstein would purchase all the merchandise at 50 cents on the dollar.

The first attempt to obtain the money was made by approaching the appellants Gleit and Levy, who were doing business as the Eastern Ladies' Ready to Wear Company, which was a business trading in ladies' wearing apparel. At the interview, Gleit and Levy were both present. Gleit stated that he would not invest any money in any more "rackets," but he would buy merchandise from them. He left the conference, and Levy stated that he had a "mockey" as a

partner, but would try to obtain the money from him. Levy invited the conferees to come again. Rosenstein referred them to a furrier on Twenty-Sixth street, New York City, as one who might help finance the scheme, and later introduced them to another person, who refused to participate in the transaction. When Rosenstein obtained knowledge that Gleit and Levy had been approached in the matter, he objected to their entry into the business because of business rivalry.

After considerable efforts and failure to obtain the money, Rosenstein announced to Fox and Greenberg that the delay would work to their advantage, for in the meantime the rating books of Dun's and Bradstreet's Agencies were going to press, and so it would probably be too late for their reports to contain the change of ownership of the Star Furniture & Carpet Company. Finally, Rosenstein introduced the defendant Murray Gold, who was unknown to Fox and Greenberg. Various meetings ensued, and finally Gold, Fox, and Weinberg inspected the Star Furniture & Carpet Company together, and thereafter money was obtained; a lawyer was employed to draw the necessary papers for the sale of the business; the money was deposited in a bank and a check drawn upon it. Gold testified that the money was furnished by Rosenstein and that he was repaid. Rosenstein asked him to keep that fact a secret. Weinberg then carried on the business.

After the conspirators had met Rosenstein, at which time the plan of operation was outlined by Rosenstein, it was agreed between them that in purchasing merchandise they would do so under the name of the Star Furniture & Carpet Company, and, when asked who was its principal, to name Weinberg, but they were cautioned not to do so unless it was necessary. Rosenstein suggested the purchase of "good, expensive merchandise," and no "cheap junk," and Greenberg suggested Chinese rugs. Cards were ordered, and Chinese rugs were purchased, and Rosenstein suggested that there was a radio show, and to purchase there. Greenberg, Gold and Weinberg were in possession of the Star Company. Rosenstein delayed the purchase of merchandise for a few days, until he got a warehouse for its receipt, which he did, receiving merchandise there. Greenberg told the defendant Goldman that he was operating a "racket," and this conversation was reported to the defendant Fox, who was instructed to communicate with Goldman and did so, at which time the appellant Palmer was introduced by Goldman to Fox as Goldman's partner. It was arranged that payment on the basis of 50 cents on the dollar be paid for an order of Chinese rugs, which was delivered at 210 Canal street, where Greenberg met Fox, subsequently passing the money at the Canal street address. Several days later, Fox, Palmer, and Goldman met. Another order for rugs was given by Goldman, which was delivered at the store at No. 1 Lispenard street. After this delivery, Greenberg joined Fox.

Greenberg and Fox later met Goldman, who suggested that they obtain a warehouse, which would be a central meeting point between them. Later Fox got in touch with Goldman, who, together with Palmer, took Fox to a place located in the neighborhood of Washington and West streets, which they did not rent. They did rent and move into premises 359 West Broadway, which was found by Goldman. After this lease, delivery was made to Palmer and Goldman. Palmer at one time refused to buy, because he thought the prices were too high, and there was no sale. But the following morning Fox met Goldman and Palmer at another place. An attempt was made by Fox to satisfy Palmer that the prices were not too high, by exhibiting to Palmer invoices from the wholesalers who had sold the merchandise to the Star Furniture & Carpet Company. Palmer testified. He admitted going to the West Broadway place, stated that he refused to purchase, because, after introduction by Goldman, he was informed that Fox had been convicted in connection with another "racket." This sale fell through a second time. But Fox again met Goldman, and offered to bring some other wares that Goldman would pick out, silverware, bedspreads, and curtains which were later loaded in a five-passenger motor car and brought to the place on West Broadway. When the car was driven to this place, Goldman and Palmer were there in their own car. The merchandise was exhibited and found satisfactory, calculations were made and exhibited to Palmer, and the money paid therefor. The articles were moved from the Fox car to the Goldman and Palmer car, and Palmer aided in the loading. Greenberg was there introduced to Palmer as Goldman's partner.

At the time the merchandise was being purchased, the trading was in the name of and on the rating of the Star Company. Change of ownership was made known to Bradstreet's on October 8, 1927, but this knowledge was not in the rating book issued

October 1, 1927, and the next issue was in January, 1928. Appellant Marcus was introduced to Fox by Rosenstein, with a statement that Marcus would help him handle the proposition. The part Marcus played was issuing the checks. He was instructed by Rosenstein to look for a warehouse; some place where the merchandise could be sent to, other than Rosenstein's place on Thirty-Eighth street. During the time of this search, Rosenstein decided to receive merchandise in his store. A delivery was made in the basement, and a check issued by Marcus after Rosenstein checked the figures. Marcus issued the check, which Fox indorsed in the name of Weinberg, and Rosenstein indorsed it, giving it to his employee to be cashed at a café.

Bills and checks were offered in evidence. From these it appears that the purchases were at 55 cents on the dollar. The additional 5 cents was obtained to pay back the $5,000 previously furnished through Gold and is referred to as the "nut money."

There were several other shipments to Rosenstein's store and then it was arranged that the warehouse on Thirteenth street, Brooklyn, be used. A shipment was sent to this Brooklyn address on October 11, 1927, and Smith, an employee of Rosenstein, issued the check on this occasion, instead of Marcus. Exhibit 7, showing the memorandum of this transaction, was in Rosenstein's handwriting. Shipments continued to both the Thirty-Eighth street and Thirteenth street places almost daily, and, at times, three to four shipments a day. At one time Smith refused to issue more checks, because they were coming back, and he became alarmed. So-called "heavy stuff" went to Brooklyn, and the "light stuff" to Thirty-Eighth street, New York. Transactions of this kind continued until the arrests were made.

About this time, Greenberg received a call from Levy, in response to which he went to see him, and there met Gleit. They accused Greenberg of running another "racket," and demands were made of him for the repayment of moneys owed in a previous "racket," as well as the sale of merchandise from this one. There was to be a profit-sharing arrangement between Rosenstein and his employee, Smith, as to articles which were received in and sold from the Thirteenth street place. During the course of these transactions, bills were issued by Fox and Greenberg, signed by Weinberg, so that there would be some protection by filing them in the event that there was an arrest. Some

of these were left with Smith by Rosenstein, and were offered in evidence. During the course of these transactions, Rosenstein and his brother-in-law and Smith divided the silverware. They found a bill with the top torn off on a carton in which the silverware was contained, and, in order to approximate the value of the articles which each was taking, Rosenstein made the calculations, and this, in his handwriting, was offered in evidence.

After the arrests, it was arranged by Rosenstein that the balance of the goods be removed from the Thirteenth street place. Marcus, who operated at Rosenstein's place, admitted that he had never handled this grade of merchandise before; that he had issued the checks and received the bills referred to, and the only place from which he bought merchandise while at Rosenstein's was from this group. His purchases were made while the so-called "racket" was being run, from October 5th to October 28th. He makes no satisfactory explanation of cashing the checks at a café, rather than at his own bank, a block and a half away from his place of business in Brooklyn.

The evidence amply connected each of these appellants with the commission of the crimes charged and for which each has been convicted. Rosenstein and Marcus, Palmer and his partner Gleit, and Levy purchased articles pursuant to this conspiracy with full knowledge that they were received from the Star Company, which was an instrument of fraud, in the purchase of furniture and household equipment, including curtains, silverware, and toilet articles, from manufacturers or wholesale houses. The evidence as to Gleit and Levy shows solicitation of them to advance the money and become partners in the fraudulent scheme, and their refusal to invest money; but it does show their willingness to purchase some of the merchandise so obtained, and there is evidence to show that they did so purchase some articles which were billed to them.

Error is assigned, alleging that one of the jurors was disqualified for service for the reason that he resided at Jackson Heights, Queens county, outside of the Southern District of New York. Objection to this juror's qualifications was not made at the time of his examination, but when the testimony progressed well into the government's case, at which time counsel asked to withdraw a juror, stating that one of the jury was not a resident of the district. Title 28, § 411, of the U. S. Code Ann. (Judicial Code, § 275), provides that "ju-

rors to serve in the courts of the United States, in each state respectively, shall have the same qualifications, subject to the provisions hereinafter contained, and be entitled to the same exemptions, as jurors of the highest court of law in such state may have and be entitled to at the time when such jurors for service in the courts of the United States are summoned."

The New York requirements as to qualifications for jurors was considered in People v. Cosmo, 205 N. Y. 91, 98 N. E. 408, 39 L. R. A. (N. S.) 967. They are found in the New York Judiciary Law, arts. 16, 17, §§ 502, 598. In the Cosmo Case, the court pointed out that, under section 1180 of the Code of Civil Procedure, objection to the qualifications of jurors was available only upon a challenge. This applied in a criminal case. Moreover, in a criminal trial, where the challenge is to an individual juror, it " 'must be taken when the juror appears, and before he is sworn,' (Code Cr. Proc. § 371), although in the latter case 'the court may, in its discretion, for good cause, set aside a juror at any time before evidence is given in the action.' " The court said:

"If defeated parties were in all cases to be permitted to move for new trials on such grounds as that a juror has passed the age of 70 when he sits in a case, or has disposed of his property, or that he is lacking in any other of the several technical qualifications which do not affect his intelligence, and fairness, no judgment would ever be safe from attack, and no trial could ever be confined to anything like well-defined or limited issues."

The judgment should not be set aside. It is different from the situation where a juror is not fair or impartial, or is mentally not qualified to fulfill that office, and moreover, "if the objection is not raised when the jury is drawn, the parties are concluded, although the fact may not have come to their knowledge until after the trial."

In Kohl v. Lehlback, 160 U. S. 300, 16 S. Ct. 304, 40 L. Ed. 432, the claim was advanced that Kohl had been deprived of his constitutional rights because one of the jurors who tried him on the charge of crime, for which he had been convicted, was an alien. The writ of habeas corpus sued out, testing this question, was dismissed, and the court said, after reviewing the authorities:

"The disqualification of alienage is cause of challenge propter defectum, on account of personal objection and, if voluntarily, or through negligence, or want of knowledge,

such objection fails to be insisted on, the conclusion that the judgment is thereby invalidated is wholly inadmissible. The defect is not fundamental as affecting the substantial rights of the accused, and the verdict is not void for want of power to render it."

■ Failure to come within the statutory requirements, such as citizenship, age, property, sex, and residence, which does not go to make up the essential qualities to enable a juror to perform his duties intelligently and impartially, may be waived by a defendant, even where such waiver consists of excusable want of knowledge, and even though he may have successfully objected to the juror sitting at the time of his examination. Raub v. Carpenter, 187 U. S. 159, 23 S. Ct. 72, 47 L. Ed. 119; Queen v. Hepburn, 11 U. S. (7 Cranch) 290, 3 L. Ed. 348.

In Fisher v. Yoder (C. C.) 53 F. 565, a juror sworn in the case was a nonresident of the district where the case was tried. He had previously lived there, but had moved. This fact was not learned until after the trial, and the court said:

"The general line of decision is that nonresidence of a juror is not, of itself, a sufficient reason to compel the grant of a new trial. It is a question of sound discretion whether, under all the facts connected with the case, it should be done."

The time to object to a juror's qualification is before he is sworn. When the application was made to the trial judge for a mistrial, he properly exercised a sound judicial discretion in denying it.

■ The appellant Marcus assigns error, claiming a violation of his constitutional rights, because he was compelled to produce evidence against himself. During the course of the trial on direct examination, one of the witnesses in some detail referred to checks issued by Marcus. He testified to the cashing of the checks. The question was asked as to what was stated in the check. Objection was made on the ground that the check was the best evidence. Thereupon this appellant was called upon to produce the check. A motion was then made to withdraw a juror, which was denied. The court instructed the jury to disregard this request, stating that the appellant was not called upon to produce papers in his possession to be used against himself. This admonition was asked for by both counsel for the government and counsel for the appellant. These circumstances distinguish the case from Mc-

Knight v. United States (C. C. A.) 115 F. 972. If it was improper to ask for the production of checks, that error was cured by the caution given to the jury by the trial judge. Bain v. United States (C. C. A.) 262 F. 666; Fitter v. United States (C. C. A.) 258 F. 568. Moreover, it appears that, at the request of his own counsel, Marcus produced checks showing the purchase of merchandise, as well as the bills therefor.

■■ Error is assigned for the alleged improper admission of testimony given by the witness Fox as to previous transactions of like character had with Rosenstein, Marcus and Levy. It is not a criminal offense to purchase merchandise from conspirators, but it is a crime to purchase it with guilty knowledge and a fraudulent intent. Such a purchase is not by accident or mistake. Knowledge and intent are necessary and essential elements to the government's case. This testimony to which objection is now made was admissible, as tending to establish guilty knowledge and intent. Trent v. United States (C. C. A.) 228 F. 648; Schultz v. United States (C. C. A.) 200 F. 234; Moffatt v. United States (C. C. A.) 232 F. 522. All the defendants were jointly charged with the conspiracy. The character and extent of their business and dealings in common or together was material in determining their intent and knowledge of the fraud being perpetrated and their participation in the conspiracy. But, when objection was made to this line of questions, the court instructed the jury, "These defendants are not being tried for the purchase of goods in other rackets, gentlemen," and at the request of counsel for the government, the court instructed the jury to disregard that testimony. Where there is an objection of this kind, and later an admonition by the court, there is no error, even though testimony were inadmissible. Maupin v. United States (C. C. A.) 23 F.(2d) 471; United States v. McCann, 32 F.(2d) 540 (C. C. A. 2d, May 6, 1929).

■ Error is assigned for failure to grant a continuance of the case, when appellants were called for trial, because of recent change of counsel. This was a matter for the exercise of sound discretion. The court denied the application and stated sufficient reason therefor.

■ It is argued that the defendants could not be legally charged with concealment of assets, or aiding or abetting therein, from the ancillary receiver appointed in the Southern District, or from the trustee. Section 29 of the Bankruptcy Act, supra, in defining the crime, enumerates "receiver, trustee, United States marshal, or other officer of the court charged with the control or custody of property, or from creditors in composition cases, any property belonging to the estate of a bankrupt." The statute in no way limits the persons from whom concealment can be had. The clause "or other officer of the court charged with the control or custody of property" covers an ancillary receiver.

■ The further argument that the combination of counts of conspiracy, together with a substantive count of concealment, may not be contained in one indictment, is without merit. The joinder of conspiracy and concealment counts as to the trustee with the counts relating to the ancillary receiver is proper, for all the offenses charged belong to the same class of crimes. Frieden v. United States (C. C. A.) 5 F.(2d) 556; Anderson v. United States (C. C. A.) 273 F. 20; section 52, tit. 11, U. S. Code (11 USCA § 52).

We have examined the other errors assigned, and find no merit in their claims.

Judgment of conviction as to each appellant affirmed.