## UNITED STATES v. SHURTLEFF et al.
### No. 273.

Circuit Court of Appeals, Second Circuit.
Aug. 4, 1930.

DuBois J. Gillette, of New York City (David V. Cahill, of New York City, of counsel), for appellants.

Charles H. Tuttle, U. S. Atty., of New York City (Lowell Wadmond, Asst. U. S. Atty., and Elbridge Gerry, III, both of New York City, of counsel), for the United States.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from judgments of conviction for conspiring to use and for using the mails in a scheme to defraud. The appellant Shurtleff was sentenced to four years and appellants Herbert C. Locke and John T. Locke for three years to the Atlanta Penitentiary. The trial occupied six weeks. Shurtleff himself testified, and the experienced judge who presided at the trial stated at the time of sentence that in his opinion the verdict was amply justified and that it would have been a matter of great regret to him had it been otherwise than it was.

The Canario Copper Company, an Arizona corporation, held all the capital stock of the El Canario Copper Company S. A. and 75 per cent. of the Copper Mountain Mining Company, S. A., which were both Mexican corporations owning certain lands in Mexico supposed to contain veins of copper. The total capitalization of the Arizona corporation was 2,000,000 shares of the par value of $1 each, all of which were issued to the owners of the capital stock of El Canario Copper Company and the Copper Mountain Mining Company, or a consolidated company into which they were merged in exchange for their stock. Of the 2,000,000 shares, 1,-500,000 were donated back to the Arizona Company for working capital. Of the remaining 500,000 shares, Shurtleff retained 175,001 shares. The Arizona company was succeeded in 1919 by a Delaware corporation with 2,000,000 shares of the par value of $10, instead of $1, each. The old company went out of existence, and the new Delaware company purchased its shares from its stockholders by issuing its own stock therefor. To carry out this recapitalization, the value of the old stock was written up to ten times its par or original value by the direction of Shurtleff.

Finally the stock of the Canario Company of Delaware was all got into the hands of Cameron Michel & Co., a corporation with which Shurtleff was connected, and of which he became president in July, 1925; on the death of Michel. This concern purported to act as fiscal agent of Canario Copper Company. At an early period it had 800,000 shares of the Canario stock, and later acquired the 1,200,000 shares remaining. According to its books, the price for these shares was $2,488,743.15. The books showed credits upon the amount due for this stock of $809,578.08 representing disbursements for the Canario Copper Company and fees for services to it. This left a balance due Canario from Cameron Michel & Co. on December 31, 1926, of $1,679,165.07. The books also showed sales by Cameron Michel & Co. of 1,971,084½ shares of Canario stock to customers at $5,585,381.74, purchases from customers to the amount of $323,384.95 and balances due from customers to the amount of $128,163, making a net aggregate received from customers of $5,133,833.80. The disposition of this sum was not accounted for, and was sought to be explained only in the most inadequate and general way.

Cameron Michel & Co. conducted campaigns for the sale of the Canario stock. One circular was sent out through the mails to from 17,500 to 18,000 persons, and at one time about 57,000 pieces of mail were posted in a single night. One market letter (Exhibit 11a) from Cameron Michel & Co., under date of December 11, 1920, said: "The year's work has resulted in the blocking out of 200,000 tons of commercial ore and 20,-000,000 tons of partially developed ore which can be blocked out by the extension of the workings above the 250 foot level."

The market letter of January 26, 1921 (Exhibit 11b), said: "Last year about twenty million tons of sulphide copper ore were developed in the Lillie Segunda mine and it is planned to complete the developments of a total of at least one hundred million tons of copper sulphide ore of good commercial grade this year."

It also said: "Canario has no problem of any sort confronting it. It already has excellent railroad transportation facilities which should be substantially improved in the near future."

Shurtleff himself admitted that none of the ore referred to was fully blocked out and that the railroad facilities were prospective and not actual, for they required the construction of a great many miles of road before there was access to the mines.

In the market letter of October 20, 1924 (Exhibit 61a), which puffed the Lillie, Batamoti, and Canario (so-called) mines, the following statement was made under the heading of "Earnings": "These are estimated to be 50% on par or nearly 150% on stock costing $4. Later as the Canario mine itself is made productive, this earning should materially increase. In other words, with all three properties in full operation the rate of earnings just mentioned should be exceeded."

Shurtleff admitted that there never were any earnings.

The market letter of March 28, 1925 (Exhibit 85), said that the "Lillie mine has developed an extensive sulphide copper ore zone estimated to contain from 20 to 30 million tons of commercial ore and its primary ore zone is well along in process of development with most excellent results accruing.
* * * "

On cross-examination, Shurtleff testified that no work had been done on the Lillie mine for six years.

In the market letter of October 24, 1925 (Exhibit 123), was an admitted gross misstatement issued to the public and only sought to be excused because of haste in getting the letter out. It read as follows: "The time has arrived when there is no doubt as to achieving early and maximum results in the Batamoti mine. With the sampling mill in operation and the blocking of $6,000,000 gross per month shareholders can look for a decided change in the market situation of Canario."

The market was manipulated and the price of the stock advanced on many occasions by matched orders or "wash" sales. All this was directed by Shurtleff and Herbert Locke.

In July, 1925, one of the most flagrant misstatements in the whole case was made. In a market letter by Cameron Michel & Co., dated July 18, 1925, advocating investment in stocks of copper companies and setting forth in successive headings the capitalization, range of prices of stock, and other data of such leading companies as Anaconda, American Smelting & Refining, Calumet & Heckla, Chile, Cerro de Pasco, International Nickel, Kennecott, Miami, Nevada, and Old Dominion, appeared a paragraph devoted to Canario Copper Company in which that company was placed side by side with these established corporations. After some adulation of its properties and prospects was the recital that "the company is in a financial position to successfully carry out all its plans and to have remaining a substantial amount of operating capital," and in a foot-note appeared this false statement: "Funds on hand July 15, 1925, for development and equipment of properties and working capital, $1,-860,539, consisting of $1,200,500, cash and $660,539, notes receivable."

This letter went to the public, and both by reason of its form and its substance was a most misleading circular. The $1,200,500 was a bank credit represented by a check of a company in which Shurtleff was interested, known as Copper Exploration Company. This company was supposed to have purchased 400,000 shares of Canario stock from Cameron Michel & Co. at $3 per share, its check to have been given to pay for it and then to have been passed by Cameron Michel & Co. to the Canario Copper Company to reduce their indebtedness to Canario for the 1,200,000 shares of its treasury stock which Cameron Michel & Co. had bought but not paid for. But the sale of 400,000 shares of stock by Cameron Michel & Co. to Copper Exploration Company was a mere myth and never took place. The Broadway Central Bank, through which the various checks passed, did allow a temporary credit of $100,-000 to be passed to Canario, but the remaining $1,100,000, of the $1,200,000 which went to its credit on July 15, 1925, was canceled by a check drawn to offset it on the next day. The original check for $1,200,000, which represented the illusory credit to the Canario Copper Company, was drawn by the appellants Shurtleff and Herbert C. Locke, and the counter check for $1,100,000 was signed by them also. Shurtleff tried to explain this transaction by saying that for months he supposed the sale had gone through as agreed and that the cash remained to the credit of Canario, but the explanation not only was expressly contradicted by the testimony of the vice president of the bank, who said that the credit was a "wash" transaction, but was inherently improbable. These fictitious bank entries were plainly concocted by Shurtleff and his adjuvants as a basis for justifying the false financial statement appearing in the circular of July 18, 1925.

Appellant John Locke was engaged in making sales of the Canario stock, and both he and his brother Herbert C. Locke and

Shurtleff issued instructions to the salesmen who were "pushing" the Canario stock. Herbert Locke and Shurtleff also gave the orders to the curb brokers who were making the market for them in this stock and advancing the price.

October 23, 1925, the market in the Canario stock which had been put up since May, when it was about $3.50 to $8.25 per share, broke to almost nothing, and the stock had to be taken off the curb and was never reinstated. In spite of this, propaganda by Cameron Michel & Co. was resumed in 1926, accompanied by the most extravagant circulars offering Canario stock at $1.25, with an agreement to buy it back within six months at $1.50. The circulars (Exhibit 198) said: "There is behind us a property of value, a conservative $25 per share value. * * * Buy Canario now. * * * Your opportunity to secure it at $1¼ expires on November 15th. Make your reservation by wire—up to 1,000 shares."

In a later circular (Exhibit 220) Cameron Michel & Co. offered the stock at $2.50 per share saying: "Even at $15 to $20 a share there would be inadequate reflection of the mine values which have been placed behind this property."

In what appears to be the last circular (Exhibit 245) before the government investigation was started, the same concern offered the stock at $2 per share, and quoted Shurtleff as saying: "The Batamoti ore body is developing to a gigantic size while at the same time the ores throughout this development are identical in makeup. * * * I believe that the company's Lillie mine will prove to be a much greater mine than either Batamoti or the Pilares. * * *"

Finch, the government mining expert who inspected the mines, testified that the Lillie mine was closed down and had no equipment; that the defendant Anderson, who has not appealed, said to him that he estimated that there were 20,000,000 tons of ore running not over 2 per cent. copper, but that this was too low a grade for profitable working; that at the Batamoti mine "the development had reached the point where it is proof positive that no money should be spent with the expectation of finding profitable ore." He added that in his opinion it would take 40 miles of railroad to reach this particular mine. He found no mine of value on the premises.

■ While there is the usual defense of an honest reliance upon engineers' reports, Shurtleff, the only one of the appellants who

testified, made scarcely any attempt to show that the mines had real value or that the statements in the circulars were not untrue and misleading. The failure to establish any basis for the good faith in the enterprise which is asserted, and its own utter worthlessness, make the guilt of the defendants certain and made their conviction inevitable. We have dwelt upon the facts at unusual length because the appellants complain that the trial court went too far in admitting evidence of intent and in other rulings. Their counsel stated both in his brief and on argument that he made no claim that a case was not made for the jury. We hold not only that a case was made for the jury, but that the proof of guilt was overwhelming. It would require error of a most prejudicial nature to justify a reversal.

The first point raised by the counsel for the appellants is that it was prejudicial error to admit evidence of other transactions by Shurtleff, similar to those alleged in the indictment, but not connected therewith. For example, Dunning, a witness called by the defendants, as well as Shurtleff himself, was asked about other mining enterprises in which Shurtleff had engaged, and interrogated as to whether the companies paid a dividend and whether the stocks were sold to the public. The decision of this court in Marshall v. United States, 197 F. 511, is relied on as showing that this was error. We there said that, when a fraudulent scheme is once established, there is no necessity for resorting to other transactions, and remarked, at pages 513 and 515, that "it did not tend to prove the guilty intent of the defendant as to the scheme in controversy to show that he had operated it before. * * * The moment the fraudulent scheme is established, there is no necessity for resorting to other transactions. * * * No one can have an innocent intent in devising a fraudulent scheme."

■■ The strict limitation in the Marshall Case of the right to show intent by proof of other similar transactions has been modified by later decisions of this court such as United States v. Rosenstein, 34 F.(2d) 630, and Farmer v. United States, 223 F. 903. It can hardly be said, as the opinion in Marshall v. United States, supra, seems to say that, because the government has made a prima facie case for the jury and rested, intent is no longer in the case. Intent is always vital when fraud is in issue, and, while the introduction during cross-examination of the testimony criticised may have been out of order,

yet that of Shurtleff contained assertions of his good faith which his action in respect to other worthless stock-jobbing enterprises might dispel. It was as well to introduce it on cross-examination as to wait for rebuttal. Testimony as to other transactions can be abused and should be received with restraint because it involves trying out issues not primarily involved and of which a defendant often can have no warning and to meet which he is often not well prepared. But such evidence is probative where intent is in issue and subject to clear abuse of discretion should be left to the judgment of the trial court. As Judge Lacombe said in Farmer v. United States (C. C. A.) 223 F. at page 911: "The Marshall Case * * * was sui generis."

In King v. Armstrong, [1921] 2 K. B. 555, the defendant was indicted for the murder of his wife by administering arsenical poison. The defense was that she committed suicide. The defendant had purchased arsenic and made it up into a number of small packets. His explanation was that he purchased it for use as a weed killer. The prosecution, in order to show that his possession was not innocent, offered proof that *eight months after the death of his wife* he administered arsenic to another person and the evidence was allowed by the trial court. The Court of Criminal Appeal sustained the ruling of the court below as tending to show that the defendant did not have the arsenic for an innocent purpose, and affirmed the conviction. See, to the same effect, Regina v. Geering, [1894] A. C. 57. Thus it appears that the English courts allow the greatest latitude in admitting proof of other similar transactions where intent is involved.

■■ We cannot say that proof that Shurtleff was constantly engaged in promoting unsuccessful mining ventures would not tend to negative his claim that he believed the Canario enterprise had the great value he represented it to have. Moreover, there was proof in the case of Shurtleff's ability and experience in mining and his position in the mining world. It was not unreasonable, therefore, to show that all his asserted preeminence was really of inconspicuous quality. But, in addition to this, we do not regard the testimony objected to as of sufficient weight to make reversible error. Little relative space was given to it in a record of four huge volumes compiled during a six weeks'

trial, and in the mass of primary transactions showing guilt it was of slight importance. There may have been error in not requiring the government to show more precisely what was done in some of the other companies whose stock was sold by Shurtleff, and in limiting explanations by him of these enterprises, but much of the testimony about other companies was of the most negative character. As we read the record, these matters were of trivial consequence and cannot reasonably be thought to have affected the result. The contention that the testimony was incompetent as against appellants Herbert and John Locke is of no merit. It was not objected to on that ground. Moreover, it contained no reference to them, and can only be thought to affect them in the most remote and indirect way. We do not regard it as prejudicial.

■ The proof of the losses of Michel was competent under our recent decision in Rice v. United States, 35 F.(2d) 689. If the defendants wished to have his losses in this particular venture separated from his general loss in this and other enterprises of Shurtleff, objection to the evidence should have been specifically taken on that ground, or Michel should have been adequately cross-examined on the point.

We have carefully considered the other objections raised by appellants, and think that they disclose no prejudicial error. Perhaps the testimony that one of the Lockes wasted money at "night clubs" should not have been admitted, but the judge in his charge directed the jury to disregard it.

■ The contention that the conspiracy count in the indictment was defective because it was not alleged that the defendants proposed to use the mails in their scheme to defraud is without merit. The indictment did allege that they conspired to violate section 215 of the United States Criminal Code (18 USCA § 338) which involves a use of the mails. The pleading was informal, but we think sufficiently warned the defendants of the charge they were to meet when four of the overt acts pleaded alleged a use of the mails. Hyde v. United States, 225 U. S. at page 359, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; McKelvey v. United States (C. C. A.) 241 F. 801.

Judgment of conviction affirmed.