## Ex parte BILL CANNIS.

No. A-10736.   Oct. 16, 1946.

(173 P. 2d. 586.)

Jack L. Spivey, of Oklahoma City, for petitioner.

Mac Q. Williamson, Atty. Gen., and Owen J. Watts, Asst. Atty. Gen., for respondent.

BAREFOOT, J.   Petitioner, Bill Cannis, filed in this court a petitioner for writ of habeas corpus on April 10, 1946, seeking his release from the State Penitentiary at Mc-Alester, where he is confined by reason of a judgment and sentence of the district court of Tulsa county, entered May 17, 1938, wherein he was sentenced to a term of life imprisonment in the State Penitentiary for the crime of rape in the first degree.

This petitioner has heretofore filed a petition for habeas corpus in this court, and the same was denied on June 9, 1943. Ex parte Bill Cannis, 77 Okla. Cr. 71, 138 P. 2d 561, 562. The petition in that case was filed by petitioner himself while confined in the penitentiary, and without the assistance of counsel. In the opinion in that case it was stated :

"A copy of the judgment and sentence is not attached to the petition and the number of years imprisonment meted out to the petitioner upon his conviction is not set forth in the petition."

He is now represented by counsel of his own choice, and a full and complete record is before us.

A petition for habeas corpus was filed in the district court of Pittsburg county, on March 20, 1946, by petitioner, and denied, and thereafter the petition now under consideration was filed in this court.

Attached to the petition is a transcript of the evidence taken before the district court of Pittsburg county, and copies of other records, including a copy of the information, the appearance docket, and the judgment and sentence of the Tulsa county district court.

A response was filed by the Attorney General on behalf of the respondent, the Hon. R. B. Conner, warden of the Oklahoma State Penitentiary, in which it was alleged that petitioner was held in custody by reason of the judgment and sentence of Tulsa county. It was contended in the response that the petition presents matters that can only be heard on appeal, and that could not be heard by habeas corpus.

An order to show cause was entered by this court, and a hearing had on May 22, 1946, at which time additional evidence and certain affidavits were presented, both by petitioner and by the state.

All of the above constitutes the record in the case to be considered in this hearing.

It is revealed that petitioner was born in Patris, Greece, August 15, 1899, and came to the United States at the age of 16 years. He worked in Greek restaurants in

New York, and continually associated with people of Greek nationality. He had attended school prior to leaving Greece and reached the sixth grade, but had never attended school after coming to America. He had some understanding of the English language, but could not understand court proceedings conducted in English. Petitioner left New York and went to Dallas, Tex., but the record does not disclose the date. While living in Dallas, he evidently became associated with a woman by the name of Mrs. Winningham, who had three children, one a girl by the name of Mary Ann Opal Winningham, aged 10 at that time, and two younger children, one of whom was a deaf mute. The petitioner and Mrs. Winningham and her three children left Dallas and went to Tulsa, Okla., in the latter part of 1937, and lived together at different hotels in that city. Mrs. Winningham was considered by the proprietors of some of these hotels as the wife of petitioner, and is referred to as Mrs. Cannis. The record of the testimony taken at the trial of petitioner in Tulsa county is not a part of the record herein, counsel stating it was impossible to secure a copy of the same. However, there is attached to the petition a copy of the ex parte statement of Mrs. Millie Wormington, who was proprietress of the Brooklyn Hotel, 106½ South Boston, where the parties lived, and the statement of Mary Ann Opal Whinningham, the prosecutrix. These statements were taken by Officers Robbins and Johnson after the arrest of petitioner, and while he was in jail.

The statement of Mrs. Wormington is as follows:

"Q. What is your name? A. Mrs. Millie Wormington. Q. What do you do, Mrs. Wormington? A. I am the proprietress of the Brooklyn Hotel, 106½ S. Boston. Q. Do you know Bill Cannis? A. Yes. Q. When did you first meet him? A. About two years ago. Q. What were the

circumstances? A. He and his wife, or at least I supposed it was his wife, came in to stay in room 12 at my hotel. They brought in three children, three girls, one of them was deaf and dumb, about four or five years of age, the others I don't remember the ages. Q. How long did they stay with you? A. Mrs. Cannis and the two littlest girls did not stay quite the week out. Bill and Mary Ann, the oldest girl, stayed the week. Then they moved. A couple of days after they moved Mrs. Cannis came back. A couple of weeks after Bill and Mary Ann moved back into the same room. They moved from that room to room No. 1. Then I asked them to move because Mary Ann had no supervision at all. They were gone around three weeks and then Mary Ann came back up and begged me to take herself and Bill back and promised to be a better girl. Then I took them back and they had No. 1. Then her mother came and I judge she stayed four or five weeks and she left. Then she was gone for a short time and then came back and stayed practically all winter. Then Mrs. Cannis left again leaving Mary Ann there with Bill. Bill usually acted like a gentleman around the hotel but on two occasions he did bring women to his room, once while I was on my vacation and Mrs. Harp was in charge and once after I returned. After the second occurrence, I told him to move. When you were over there in November on an investigation (Nov. 26, 1937) I told you that he had been back the day before and was to come back but he never did come. Sometime around the first year, he and Mary Ann came back and stayed with me until February 14, when they moved. They were gone a week. During that time Mary Ann ran away from him. He moved back with me on the 21st. Mary Ann wasn't with him. Q. During the time that Mary Ann and Bill Cannis stayed with you, they both occupied the same room and the same bed? A. Yes. Q. Did Bill Cannis say that Mary Ann was his daughter? A. Yes. Q. Do you know whether Mary Ann has started her periods or not? A. Yes, she has been a woman for over a year."

The statement made by Mary Ann Opal Winningham was as follows:

"Q. What is your name? A. Mary Ann Opal Winningham. Q. How old are you? A. I'll be eleven years of age on May 19,1938. Q. Do you know Bill Cannis? A. Yes. Q. How long have you known him? A. About two years and a half. Q. Where did you first meet him? A. Dallas, Texas. Q. When did you first come to Tulsa? A. I think it was about two years ago. Q. Was Bill Cannis at the hotel where you stayed? A. Yes. On the east side of Boston, I don't remember the number. Q. When did you first start staying with Bill Cannis alone? A. About one year ago. We stayed at the Brooklyn Hotel 106½ South Boston. Q. Did you occupy the same room and the same bed? A. Yes. Q. When was the first time you ever had intercourse with Bill Cannis? A. In Dallas. Q. Did you continue to have intercourse while you were staying at the Brooklyn Hotel? A. I don't know. Yes, I know, but I'm not going to tell. Q. Are you sure you don't know? A. Well, sometimes once a week and sometimes twice a week, and I enjoyed it. Q. What position were you in during this act? A. Bill was on top of me. Q. Did he take any precautions? A. Yes, he used a rubber. Q. Why did you like to stay with Bill Cannis? A. Because he let me do what I wanted to, and gave me money to go to the shows. Q. How long have you been menstruating? A. I think about eight months. Q. You told me this morning that you have not had intercourse with Bill Cannis since you started to menstruate. Is that true? A. Yes. Q. But you have continued to sleep with him since then, have you not? A. Yes. Q. What other hotels have you lived in with Cannis? A. At 306½ S. Cheyenne and the Almeda Hotel in Bartlesville. Q. When do you think was the last time you had intercourse with him? A. Last August some time."

A complaint charging petitioner with rape in the first degree was filed on March 1, 1938. He was arrested and arraigned before the examining magistrate on March 2, 1938, entered a plea of not guilty, his preliminary hearing

was set for March 8, 1938, and he was remanded to jail. On March 8, 1938, a preliminary examination was had, and petitioner was held without bond to the district court. At this preliminary he was represented by an attorney, M. P. Houser, whom he had employed to defend him. The record discloses that another attorney, Preston C. Clark, had agreed to represent him, but the record does not disclose whether this was before or after the preliminary hearing.

The proceedings in the court of common pleas are disclosed by a copy of the appearance docket, which was as follows:
"1938

"March 1st   Filing information and issuing warrant.

"March 2nd   Defendant arraigned. Information read. Advised of rights. Pleads not guilty. Preliminary set for March 8th, 1938. Defendant ordered held without bond. Commitment issued.

"March 8th   Case called. Both sides ready. State endorsed Ed Thrasher as a witness. Twelve witnesses sworn. Reporter Gordon. State introduces evidence and rests. Defendant demurs to evidence and demurrer overruled. Defendant stands mute. Upon hearing defendant ordered held to await jury trial in District Court. Defendant held without bond. Commitment issued."

The record reveals that petitioner was brought before the district court for trial on the morning of May 12, 1938, at 9:30 a.m., the date his case was set for hearing. At this time his counsel, M. P. Houser, was permitted by the court to withdraw from the case, and the public defender was appointed to defend him. He was returned to the jail, and according to his testimony the public defender did not con-

120

sult with him, but he was returned to the court room at 1 p.m. and his trial started at that time. No request was made for an interpreter for petitioner, nor was one appointed. Petitioner in his testimony before the district judge at McAlester testified that he did not have an opportunity to talk to the attorney who was appointed to represent him and that he told the court that he was not ready for trial, but that he was put to trial at 1 p.m. The record does not disclose that his attorney filed a motion for continuance either oral or written. It is disclosed by the record that on May 9, 1938, a praecipe for witnesses was filed by the attorney employed by him at that time, Mr. Houser. This praecipe was as follows:

"Please issue a Subpoena in the above entitled cause for Dr. Stockley, 2nd & Main; Mrs. Hamilton, 106½ S. Boston; One named George—K C Pool Room 115 S. Main; One named Pete—Pastime Pool Room—Chriss—15 E. 2nd and Si Hamburger St. Gus Bohoo, Theodore Bahoo (Good Eats Club); Dadd Barum, 106½ S. Boston; Christ Economicis, 311 S. Boulder; Pete Metevillis, 17 E. 2nd; One Watson, 311 S. Boulder; 'Bill' Okla. Coney Stand, 211 W. 4th to be and appear before the District Court of Tulsa County, at Tulsa in said County, on the 12th day of May, 1938, at 9 o'clock a.m., on behalf of Deft."

The record does not disclose that a return was made by the sheriff of Tulsa county showing whether these witnesses were served, but it is disclosed by the testimony of Mr. Simms, the assistant county attorney who tried the case and who testified at the hearing before this court, that the only witnesses presented on behalf of petitioner were two character witnesses, and that the defendant himself did not testify.

Numerous affidavits were introduced in evidence, among them one by the president of the Hellenic Society,

a Greek organization in Tulsa. These affidavits show that the affiants were acquainted with petitioner, and that he was unable to speak and understand the English language, except to a limited degree, and that he could not transact business in the English language.

The attorney who represented petitioner on his motion for new trial, Q. L. Dickerson, made an affidavit that he had made numerous attempts to confer with petitioner in English but that he could not do so, and that it was necessary for him to consult with him through an interpreter, the Greek Orthodox Priest at Tulsa; that petitioner was uneducated and possessed a low degree of mentality.

The only attempt to refute these affidavits is the testimony of Mr. M. S. Simms, the assistant county attorney of Tulsa county, who tried the original case. We quote from his testimony, given at the hearing before this court:

"Q. After he said he was ready, did the defendant put on any testimony?· A. As I recall, there was one or two witnesses put on by the defense. The defendant himself did not take the stand. Q. Now, Mr. Simms, do you recall whether or not, either during the investigation of this case, while the defendant was in jail or during the trial, whether or not you had occasion to talk with him, in English? A. I am positive I talked with him in the jail, I can't recall just what was said, but I remember Bill Cannis, I remember talking to him up there in jail, it is my habit to, all those, hardly any one gets in I don't talk to him. Q. Did you have any difficulty in understanding his English he used talking to you? A. I did not. Q. Did he have any difficulty in understanding the English you used in talking to him? A. As far as I could tell, he didn't. I might say Cannis was a cook, that is his occupation. He worked in Tulsa, Oklahoma City, and many places. He was engaged as a cook at the time this happened. Q. (By Judge Jones) He did withdraw the day of the trial? A.

On May 9 Mr. Houser on behalf of the defendant praecipe for witness. Q. (By Judge Jones) What about these witnesses, did they come? A. I do not recall. Might I say this: Warren is now in Japan. Mr. Houser about six months ago was sent to the home of broken-down-mentally, he is some 70, up to the 70's. Preston C. Clarke also appeared for the defendant in some of the proceedings, on May 9th he was permitted to withdraw, as shown by the written order here, and on May 16th motion for new trial was filed on behalf of Bill Cannis by another attorney, Q. L. Dickerson. He makes an affidavit. And the motion for new trial, among other things, suggests that he needed an interpreter. * * * Q. In your opinion, and from your conversation with him, and from your knowledge of this law suit, do you know whether or not he could intelligently represent himself, to such a degree, he could appear in court and understand the proceedings had in English, the proceedings had in the court room where he was tried? A. I am entirely satisfied Bill Cannis knew what he was charged with, realized the seriousness of it. Whether or not he realized all of the court proceedings, I do not say, some I do not myself understand. Q. Will you say he did or did not understand the English language? A. I would not say he did not understand the English language. I would say this—that he was not as fluently spoken as some of the rest of us, you could understand what he was saying, I am satisfied, you might have to repeat once or twice, he could understand what you said."

We have given a somewhat detailed statement of the facts by reason of the importance of this hearing. Briefs have been filed by petitioner and by the state. Petitioner has cited the following cases: State ex rel. Tucker v. Davis, 9 Okla. Cr. 94, 130 P. 962, 44 L. R. A., N. S., 1083; Johnson v. Zerbst, 304 U. S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461, 146 A. L. R. 357; Powell v. State of Alabama, 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 159, 84 A.L.R. 527; In re Stephens, 81 Okla. Cr. 65, 160 P. 2d 415; Hawk v. Olson, 326 U. S. 271, 66 S. Ct. 116, 90 L. Ed. —; White v. Ragen, 324 U. S.

760, 65 S. Ct. 978, 89 L. Ed. 1348; Rice v. Olson, 324 U. S. 786, 65 S. Ct. 989, 89 L. Ed. 1367.

The Attorney General representing the state has attempted to distinguish the above cases, and has cited the following: Williams v. Commonwealth, 230 Ky. 327, 19 S. W. 2d 964; Henry Ching v. United States, 254 U. S. 630, 41 S. Ct. 6, 65 L. Ed. 447; Id., 9 Cir., 264 F. 639; United States v. Rosenstein, 2 Cir., 34 F. 2d 630, 14 A. B. R., N. S., 682; Commonwealth v. Flood, 302 Pa. 190, 153 A. 152; Jones v. Commonwealth, 238 Ky. 453, 38 S. W. 2d 251; Sizemore v. Commonwealth, 108 S. W. 254, 32 Ky. Law Rep. 1154.

In the brief of the state, the Attorney General has sought to distinguish the cases cited by petitioner, and in the reply brief petitioner has attempted to distinguish the cases cited by the state.

In justice to both parties, it may be said that the cases cited by each may in numerous instances be properly distinguished from the facts in the instant case. We have read all the cases, and it is unnecessary to unduly lengthen this opinion by setting out the distinctions. It may be said that each case must be determined by the facts and circumstances of that particular case, subject to the general rules of law that govern all.

It is a general rule, and has often been stated by this court, that a writ of habeas corpus will not be sustituted for appeal. Ex parte Hummingbird, 78 Okla. Cr. 33, 143 P. 2d 166; In re Sullivan, 82 Okla. Cr. 364, 170 P. 2d 260, and numerous other cases. This rule of course is recognized and will be followed.

It has also often been decided that in following the principle that every person is entitled to a fair and im-

partial trial, this court will give relief by habeas corpus if the facts are such that render the judgment and sentence void. Ex parte Robnett, 69 Okla. Cr. 235, 101 P. 2d 645; Ex parte Meadows, 70 Okla. Cr. 304, 106 P. 2d 139; Ex parte Pennington, 71 Okla. Cr. 263, 110 P. 2d 923, 928; In re Davis, 78 Okla. Cr. 444, 150 P. 2d 367.

The construction of the "due process" clause of the Federal Constitution, Amend. 14, and Art. 2, § 7 of the Oklahoma Constitution, have been before this court in many cases. It is unnecessary to cite them. We have held that this court would follow the decisions of the United States Supreme Court in the construction to be placed upon the "due process' clause of the Federal Constitution. Lyons v. State, 77 Okla. Cr. 197, 138 P. 2d 142, 140 P. 2d 248; Id., 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481.

The Supreme Court of the United States in its later decisions has been more liberal in its construction of the provisions of "due process", as it applies to criminal cases than it has in the past. Johnson v. Zerbst, supra; Hawk v. Olson, supra.

We also consider it unnecessary to give a lengthy discussion of the "due process" clause and to cite and quote from the cases construing it either by the Federal or state courts. Quotations could be given which would sustain either view presented. Counsel for the state and petitioner have cited numerous cases as above outlined, but neither has cited the leading case from this court, which discusses fully the question here involved—the question of counsel being given sufficient time to prepare for trial in a capital case. In that opinion, a full review of many authorities is given. We refer to the case of Goben v. State, 20 Okla. Cr. 220, 201 P. 812, 814. In this case, Judge Doyle, in render-

ing the decision, wrote an exhaustive opinion, in which it is said:

"Every person charged with crime, whether guilty or innocent is entitled to a fair and impartial trial—that is, a trial in accordance with the rules of law, and the principles of justice; and it is a duty resting upon the courts to see that this guaranty conferred by the Constitution upon every citizen is upheld and sustained. It is evident from the record that the defendant C. W. Goben was not accorded a trial in conformity to the laws of the state. * * *

"The granting or refusal of an application for continuance on the ground of want of time for the defendant's counsel to prepare for trial is ordinarily discretionary with the trial court. However, the discretion which the trial court exercises must be judicial, not arbitrary, and must be exercised in conformity with the laws of the state.

"The right of the accused to the assistance of counsel in making his defense has long been regarded in this country as essential to the due administration of justice in criminal cases. Says Mr. Cooley:

" 'With us it is a universal principle of constitutional law that the prisoner shall be allowed a defense by counsel.' Const. Lim. 334.

"In order that the accused may have the full benefit of this constitutional right, the Code of Criminal Procedure provides:

" 'If the defendant appear for arraignment, without counsel, he must be informed by the court that it is his right to have counsel before being arraigned, and must be asked if he desires the aid of counsel. If he desires, and is unable to employ counsel, the court must assign counsel to defend him.' Section 5773, Rev. Laws. (Tit. 22 O. S. 1941 § 464).

"The constitutional right of representation by counsel certainly includes a reasonable time within which to pre-

pare for trial. In the case of Lawson v. Territory, 8 Okla. 1, 56 P. 698, it is said:

" 'One accused of crime has the right to have the aid of counsel to defend him, and the constitutional guaranty that he shall have the right to the assistance of counsel means that he shall have the benefit of the best skill and thought that his counsel can give him; and an attorney cannot, under the most favorable circumstances, properly defend one charged with murder, without having a reasonable time to prepare his case for trial. We are of the opinion that the trial court, in compelling the defendant to go to trial the next day after the indictment was returned, and immediately upon the overruling of the demurrer, exceeded its discretionary power. The defendant should have been granted further time.'

"In Hensley v. Com., Ky., 74 S. W. 677, the conviction for murder was reversed because the court refused to grant a continuance and forced the defendant into a trial on the day the indictment was found. In State v. Collins, 104 La. 629, 29 So. 180. 81 Am. St. Rep. 150, four days was held to be too short a time in which to prepare a defense in a murder case. In the opinion it is said:

" 'This was a capital case. The life of a human being was at stake, and for the time being it was sheltered by the presumption of innocence. Great deliberation—an utter absence of precipitancy—should have characterized every movement of the court leading up to the conviction. "The law travels with a leaden heel, but strikes with an iron hand," is a maxim pregnant with obvious meaning. In this instance, it doffed the "leaden heel," yet struck with the iron hand. It is not unlikely that the previous attempt at lynching, and apprehension felt by the officers of the law of a second attempt being made in case of delay in bringing the accused to trial, may have influenced the situation to his detriment and caused the undue haste complained of. But this cannot be accorded the weight of justifying departure from the rule of calm deliberation. The right "to have the assistance of counsel" is one conferred by the Constitution itself. Reasonable time to prepare for his defense

should have been allowed the counsel, who had, by direction of the court, undertaken its responsibility. Only in this way could their "assistance" be made effective.'

"We have examined all the cases accessible bearing upon this question, and the rule appears to be well settled that, under the constitutional guaranty that the accused shall have the right to the assistance of counsel, counsel appointed to defend the accused in a capital case must be given a reasonable time to prepare for trial, to investigate the facts, and examine the law applicable to the case, and this without being forced to a showing as to witnesses, and what is expected to be proven by them. It may be stated here and in this connection that the failure of counsel appointed to defend to take 24 hours to plead, and to specifically demand that the defendant be accorded these constitutional rights, is strong and convincing proof of the necessity of the rule.

"In cases of this kind, where the defendant is to be placed on trial for his life, he should have the advantage of every right which the law secures to him upon his trial. A fair and impartial administration of the laws is one of the most sacred rights of the citizen, and it is the duty of trial courts in the administration of the law to see that the accused, however guilty he may be, shall have a fair trial according to the due and orderly course of the law, and this duty is emphasized in a capital case.

"Under the circumstances of this case, as shown by the record, counsel appointed to defend, was not allowed sufficient time to prepare for trial, and the refusal of the court to continue the case, at least to another day in the term, was clearly an abuse of judicial discretion. It follows that forcing the defendant into trial against his objections on the same day that the information was filed and counsel appointed to defend was errer prejudicial to the substantial rights of the defendant."

We recognize the facts in the Goben case may be distinguished from the facts in the instant case in a number

of particulars, but this, as above stated, is true in all cases. The general principles of law announced in that case remain the same, and it is the application of this law to the facts in the instant case with which we are concerned.

In the Goben case a motion or affidavit for continuance was filed by the defendant. Here no written motion for continuance was filed, but petitioner testified that he told the court he was not ready for trial, and the record shows that when asked by the court if the defendant was ready for trial, his attorney answered: "We are not ready, but we are ready to go to trial." In the Goben case, the defendant was arrested on March 31, 1921. He was taken directly from Comanche county to Oklahoma county, and was not returned to Comanche county, where he was to be tried, until April 12, 1921. He did not have an opportunity to secure counsel in Oklahoma county until April 5, 1921, when his father, of Lawton, Comanche county, secured an audience for him with an attorney. He did not have any counsel except about 15 minutes on the day of the preliminary hearing, April 8, 1921. The county attorney of Comanche county presented his affidavit in which he stated that five or six days before the time he had talked with Mr. A. J. Burton, an attorney of Lawton, and that he stated that he thought he would represent C. W. Goben, and that he gave him a letter to permit his seeing the defendant, and that Mr. Burton was present at the preliminary hearing.

It is true that the Goben case was before this court on appeal, and the instant case is here by habeas corpus. The record in the instant case reveals that petitioner was a foreigner, uneducated, and of low mentality. That he had a very limited knowledge of the English language, and that he did not understand court procedure and was not able to understand the testimony that was being given against

him. No interpreter was appointed by the court for petitioner. The witnesses named in the praecipe filed by his attorney three days before his trial were not present to testify, and no return made by the sheriff to show that they were served. A number of these witnesses have Greek names, and nothing appears in the record to show that the public defender talked to any of them. In fact, it is disclosed that he would not have had an opportunity to do so, if they were not present, by reason of being forced to trial on the day of his appointment. The defendant himself was not placed upon the witness stand. It is further revealed by the record that the prosecutrix had contracted a venereal disease, and that petitioner had no such disease. By the statement of the prosecutrix, it is shown that all of the relations between her and the petitioner were agreeable to her, and that she "enjoyed it." This testimony, while not a defense under the law, could have been very material in the reduction of punishment.

It further appears that counsel who had been employed by petitioner and paid by him, as stated in his affidavit, was permitted to withdraw from the case on the very day it was set for trial, and the court appointed the public defender of Tulsa county to represent petitioner, and he was forced to trial immediately, and on the same date. No attempt was made to secure a continuance. No time was asked for preparation of the case, or to confer with the witnesses. This case should not have been tried as "just another case" by the public defender. The defendant was charged with a capital offense, and was given a life sentence by the jury. We cannot believe that such punishment would have been inflicted if a proper defense had been presented, as the record in this case discloses could have been presented. The defendant did not have a fair and impartial trial, as he was entitled to under the law and the Constitu-

tion. He has already served more than eight years in the penitentiary.

We have reached the conclusion that petitioner was denied fundamental rights in the proceedings before the district court of Tulsa county, as above set forth, and that by reason thereof, the judgment and sentence was pronounced without due process of law, and that said judgment and sentence should be vacated and set aside.

It is therefore ordered that the judgment and sentence pronounced against the defendant in cause No. 8624 in the district court of Tulsa county be, and the same is hereby vacated and set aside.

It is further ordered that the warden of the State Penitentiary at McAlester, Okla., be and he is hereby commanded forthwith to deliver the custody of the petitioner, Bill Cannis, to the custody of the sheriff of Tulsa county, Okla.; and it is further ordered that the said sheriff of Tulsa county hold the said Bill Cannis pending the disposition of the charge filed against him in cause No. 8624 in the district court of Tulsa county, or until he is otherwise discharged, as provided by law in such cases.

JONES, P. J., and DOYLE, J., concur.