## KNICKERBOCKER MERCHANDISING CO., Inc., et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. July 14, 1926.)

No. 404.

**1. Post office ⊚⟞35.**

Divergence between promised performance and promisor's belief that he can perform may constitute substantial fraud, sufficient to sustain conviction under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud.

**2. Post office ⊚⟞35—To sustain conviction for use of mails to defraud, proof that promisor intended not to perform is not essential (Criminal Code, § 215 [Comp. St. § 10385]).**

To sustain conviction under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud, it is not necessary to prove that promisor intended not to perform, but only that he had no intention at all on the matter.

**3. Fraud ⊚⟞50.**

Generally, in action for deceit, plaintiff must show that defendant was dishonest.

**4. Post office ⊚⟞35.**

To sustain conviction under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud, it is sufficient if jury find that defendants had no belief they could perform promises made.

**5. Post office ⊚⟞49.**

Evidence *held* to sustain conviction under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud by merchandising scheme.

**6. Post office ⊚⟞48(8).**

In prosecution under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud by merchandising scheme, admission of evidence that defendant corporation offered as part of such scheme to give credit and pay freight to customers *held* not reversible error, though such representations were not pleaded, especially where there was no objection on that ground.

Manton, J., Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

The Knickerbocker Merchandising Company, Inc., and others were convicted of using the mails to defraud, and they bring error. Affirmed in part, and reversed in part.

Writ of error to a judgment of conviction of the United States District Court for the Southern District of New York upon 7 counts of an indictment under section 215 of the Criminal Code (Comp. St. § 10385) for using the mails to defraud. There were 11 counts in all, laying the mailing of letters at different dates; the verdict was upon counts 2, 4, 6, 7, 8, 10, and 11.

The two individual defendants, with their wives, organized the corporate defendant for the purpose of trading in groceries, and later in "notions" and dry goods. Their plan was to induce retail grocers, chiefly in the country, to buy a permanent membership in their company at a price of $100, $200, or $300, the prices rising as they went on. They advertised that members would be permanently enabled, by buying through them, to get groceries and dry goods at prices from 10 to 12 per cent. cheaper than they could buy of the ordinary jobbers, and that in this way they could compete with "chain stores." The defendants made arrangements with certain large wholesale dealers in groceries, by which they could buy at prices only 2 or 3 per cent. higher than the wholesale prices. These goods the wholesalers sent direct to the members, but billed to the corporation, which in turn billed the members at somewhat lower prices than it had to pay. Thus members bought of the corporation and the corporation of the wholesalers. To secure members, the defendants sent out salesmen on the road, and used the mails to distribute their advertisements. The salesmen were instructed to offer to members who had paid in full a term of credit and the payment of freight on some of their orders. It did not appear how often, if at all, these representations were not performed.

At the beginning of the business in June, 1922, each of the incorporators paid in $1,500 to the company, and later $2,500 more, making a total of $8,000. Each had a drawing account, and traveling expenses, for which they turned in no vouchers. They continued the business until August, 1925. For the first year the results of operation were not put in evidence, but from August 1, 1923, until January 31, 1925, the corporate books showed the following figures: The defendants had taken from members a little less than $93,000, out of which they had paid as commissions to salesmen slightly less than $40,000, leaving a net return of $53,000. Their overhead expenses came to something more than $39,000, and there had been a loss of $8,700 in the purchase of groceries from the wholesalers, which were sold to members at less than cost. There remained, therefore, $5,300 out of the amount taken in from their members. In addition, they had each withdrawn in salary some $6,600, and had together borrowed $2,200 more. Thus, during that period, they had used up all the receipts from memberships and $10,000, in addition, more than the amount originally contributed as capital.

In December, 1924, inspectors from the post office visited and examined them, and pointed out to them that their business, if continued as it was going, must inevitably end in failure. The defendants declined to accept this forecast, and continued to seek and accept members down to August of 1925, when they were forbidden the use of the mails, which stopped their business.

Upon the trial the prosecution made much of a post card, freely circulated among grocers, proclaiming with some rhetoric the advantages of the plan, and commencing with the words, "Warehouse Shipping Centers, New York, N. Y., Phila., Pa., Springfield, Mass., Worcester, Mass." The prosecution sought from these words to impute to the defendants the representation that they had warehouses of their own at the places named. In fact, they had only contracts with wholesalers as above set forth.

Hayward & Clark, of New York City (John Holley Clark, Jr., of New York City, of counsel), for plaintiffs in error.

Emory R. Buckner, U. S. Atty., of New York City (David P. Siegel and W. Houston Kenyon, Jr., Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Before MANTON, HAND, and MACK, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). The only substantial question in the case is of the insufficiency of the proof. It is perfectly true, as it usually is in such cases, that there was no direct evidence of fraud in the scheme, and unless the circumstances were such as justified a compelling inference that the whole plan at some stage became dishonest, the verdict ought not to have been taken. To decide that question, we must remember what the issues really were. [1-3] The relevant representations were promissory, and the substantial fraud depended upon the divergence between the promised performance and the promisor's belief that he could perform. That, however, is quite enough in an indictment under section 215 of the Criminal Code. Durland v. U. S., 161 U. S. 306, 16 S. Ct. 508, 40 L. Ed. 709. That is to say, it is a fraud if the promisor knows that he will not perform, for a promise is an expression of a present intent, and a present intent is a fact. Furthermore, it is not necessary to prove that the promisor intended not to perform; it is enough if he had no intention at all on the matter, or if he had no belief

whether or not he could perform, for one cannot intend that which he has no belief in his power to do. Since Lord Herschell's judgment in Derry v. Peek, L. R. 14 App. Cas. 337, it has generally been accepted that, in an action for deceit, the plaintiff must show that the defendant was dishonest. Perhaps it would be truer to say that that case quenched any disposition to diverge from Pasley v. Freeman, 3 Term R. 51, though there have been exceptions—e. g., Scholfield, etc., Co. v. Scholfield, 71 Conn. 1, 40 A. 1046. But all the judges in Derry v. Peek recognized, what had been settled law long before, that although a man might not be charged for his honest beliefs, however imbecile they might be, it was not necessary to show that he disbelieved what he said. Some utterances are in such form as to imply knowledge at first hand, and the utterer· may be liable, even though he believes them, if he has no knowledge on the subject. And all unconditional utterances, intended to be taken seriously, imply at least a belief, and, if the utterer does not believe them, they are false, though his mind be quite indeterminate as to their truth. The law in this country is so settled by a great number of precedents, of which some are given in the margin.[1]   It is perhaps unfortunate that the phrase "a reckless disregard of truth"·has been so often used as the equivalent of an absence of belief, for it adds nothing, as Lord Herschell observed, and has led to some confusion between no belief whatever and unreasonable credulity.

This rule of civil liability we extended in Bentel v. U. S., 13 F.(2d) 327 (decided June 17, 1926), to. indictments under section 215 of the Criminal Code, following as we thought the reasoning of Durland v. U. S., 161 U. S. 306, 16 S. Ct. 508, 40 L. Ed. 709, though that case is not a direct authority. We adhere to that ruling, since we see no reason why the fraudulent scheme at which the section aims should not be tested by the same rules recog-nized in the case of civil wrongs. Indeed, the inclusion of promissory statements appears to us a longer step, if step it be, than to admit absence of belief as a sufficient disparity between fact and utterance.

[4, 5] Therefore it was only necessary in the case at bar for the jury to find that the defendants had no belief that they could perform the promises held out to prospective members. Moreover, it was not necessary for them so to find at the earlier stages of the venture. Of the counts on which conviction was had, the seventh laid a letter of November 7, 1924, and it was enough, if at that time the plan had so clearly miscarried that the incorporators could no longer have believed in its success. It seems to us that the evidence justified that conclusion. The scheme involved an indefinite increase .of members, and with it an indefinite income, and, if the dues had been annual, there would have been no reason to suspect the outcome from a failure to make both ends meet between August 1, 1923, and February 1, 1925. But this was not the plan; on the contrary, each member secured permanent service for a single fee. Hence it became necessary, as the members increased, to be prepared to render service to all those whose dues had already been exhausted, as well as to those· whose dues were still coming in. So far as the business had gone, the defendants had no reason to suppose that the scheme could be successful; they had completed 2½ years of business with less than nothing in their hands of the dues already received, and were incumbered with the necessity of permanently serving the existing members at terms which involved serious loss. As the new members came in, the expense of serving them would, unless things changed, ·again consume more· than their dues, and nothing would be at hand to support the earlier burdens. Their liabilities, like a snowball, gathered bulk as they proceeded, and nothing was at hand to meet them.

Plainly, if the defendants had reflected at all, it must have been apparent to them that, unless there was a change, they must sooner or later come to an end. Their defense could only rest either in their inability to understand what they had accomplished, or in hopes that some change would occur. The first is. scarcely a tenable hypothesis; they were warned early in December, 1924, by the inspectors, and persisted till they could go no further. True, this may be evidence of faith in their eventual success; but it is also evidence that they had not gone till November

---

[1] Cooper v. Schlesinger, 111 U. S. 148, 4 S. Ct. 360, 28 L. Ed. 382; Hindman v. First Nat. Bank, 112 F. 931, 50 C. C. A. 623, 57 L. R. A. 108 (C. C. A. 6); L. J. Mueller Furnace Co. v. Cascade Foundry Co., 145 F. 596, 76 C. C. A. 286 (C. C. A. 3); Kountze v. Kennedy, 147 N. Y. 124, 41 N. E. 414, 29 L. R. A. 360, 49 Am. St. Rep. 651; Adams v. Collins, 196 Mass. 422, 82 N. E. 498; Alpine v. Friend, 244 Mass. 164, 138 N. E. 553; Whitehurst v. Life Ins. Co., 149 N. C. 273, 62 S. E. 1067; Krause v. Busacker, 105 Wis. 350, 81 N. W. 406; Krause v. Cook, 144 Mich. 365, 108 N. W. 81; Braley v. Powers, 92 Me. 203, 42 A. 362; Davis v. Central Land Co., 162 Iowa, 269, 143 N. W. 1073, 49 L. R. A. (N. S.) 1219.

7th in ignorance of the facts. And so the question really resolves itself into the good faith of their belief in a change. The natural place to look for that is in their own testimony, for each took the stand in his own behalf.

Innerfield said that in time he hoped to get warehouses of their own, like those of the Creasy Corporation, which manufactured under its own label. The explanation hardly answers the necessities. The Creasy Corporation added an overhead to their cost, which the defendants did not, and warehouses of their own could do no better than they were already doing, because, as things stood, they got all the advantages of wholesale buying, at an addition of only 2 or 3 per cent., and they had sold for less even than these prices to give their members the agreed discounts. Any possibility of manufacture was certainly the merest speculation. Moreover, whatever were the hopes with which they started, how could they have expected to build warehouses, when their business, instead of accumulating a surplus, had already exhausted even the small capital with which they began? Seaman said that they expected the fees to cover overhead, and eventually to have their warehouses, but that this must await enough members in a given locality to justify a warehouse there. But again it is quite incomprehensible that a single fee should indefinitely cover a continuous overhead, or that they could establish a warehouse anywhere under a system which exhausted itself shortly after it was installed.

Of course we cannot say that the defendants could by no possibility have believed all this, and the jury had to conclude that they did not. Our duty is only to say whether reasonable men could have reached the verdict, and it seems to us that there was ample ground on which they might. We have no ways of reaching each other's minds, but by the rude standard of assuming that men are alike, and checking the assumption by the appearance and demeanor of the individual. Perhaps there are better ways, but many a man has lost his liberty, and will lose it, for no better reason than because twelve ordinary men concluded that what most men would have believed he believed; because he could not convince them that he was egregious in this way or in that. This was a scheme which did, and on every sane theory must, fleece the unsophisticated. If these defendants thought otherwise, like all of us, they stood in peril to satisfy their peers of their obtusity.

[6] The only remaining question is the admission of proof as to the representations that the corporation would give credit and pay freight. The error assigned is that these were not charged in the indictment. There are several answers: First, we can find no objection to the proof on that ground. Second, it does not appear, at least definitely, that the defendants did not make good these representations. Third, if they did not, it was not fatal that such false statements were proved to show the fraudulent character of the scheme. Harris v. U. S. (C. C. A. 2) 273 F. 785. Fourth, if there was any error, it is plain from the record as a whole that it could have had only a trifling effect upon the result.

In the view which we take of the case, the inference became stronger as time went on. The letter laid in the seventh count was the last proved, and was in our judgment late enough. It is indeed impossible and unnecessary to say just when the situation became such as justified a jury in concluding that the defendants could no longer suppose that they could perform their obligations. Moreover, the whole question is purely academic anyway, as the sentence was concurrent on all counts. Nevertheless, out of abundant caution, we affirm the judgment only on the seventh count.

Judgment affirmed on the seventh count; reversed on the second, fourth, sixth, eighth, and eleventh counts.

MANTON, Circuit Judge (dissenting). Every fair construction of the evidence in this record shows an earnest as well as honest intention on the part of the individual defendants to embark in a merchandising business which may or may not have been sound economically—varying with the opinion of men. The law never proposed to deprive men of their liberty for crime without proof of a criminal intent. Mere mistake never caused imprisonment; such is the pride of our law enforcement. Every stipulation of employment by the defendants' customers was made by fulfillment of orders with prices as promised. Arrangements were made with wholesale grocers to supply merchandise. The defendants, young and enthusiastic, kept their every pledge and promise in every particular. After the wholesaler, under the spur of competition, complained to the postal authorities, the latter questioned the prospect of the future of the business, and after a while stopped the defendants' use of the mails. The business judgment of the postal authorities became supreme, in so far as the use of the

mails was concerned. That was the first time any customer of the merchandising company suffered. Loss in business the first months was to be expected, particularly when embarking upon a new method of merchandising and building up trade. Full faith in the enterprise commanded the defendants to continue on after notice and inquiry by the postal authorities. The prohibition of the use of the mails came later. The continued use of the mails in carrying on their business after the investigation started was evidence of good faith, rather than the contrary, as the prevailing opinion reads. There is no evidence of criminal intent, and not the slightest of fraud or a fraudulent scheme. The sending of the seventh letter was as innocent as all the others. The defendants should never have been deprived of the full use of the mails in their business. It is most regretful that imprisonment will follow from such a fanciful doctrine of what amounts to a fraud.

I dissent.