## UNITED STATES v. HAUG.

### No. 365.

Circuit Court of Appeals, Second Circuit.

July 16, 1945.

Jacob J. Rosenblum, of New York City, for appellant.

John F. X. McGohey, U. S. Atty., of New York City (K. Bertram Friedman, Asst. U. S. Atty., of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The appellant, Haug, was convicted upon two counts of an indictment, found under § 311 of Title 50—War Appendix, U.S.Code Annotated. The first count charged him with failing from October 16, 1942, until January 15, 1944, "to keep his Selective Service Local Board, * * * advised at all times of the address where mail would reach him," in accordance with § 641.3 of the Regulations. The second count charged that he failed "to fill out, complete and return his Selective Service questionnaire," in accordance with § 621.2 of the same Regulations. The cause came on to be heard before a judge and a jury, and the prosecution called one, Hallett, a special agent of the Bureau of Investigation who had twice interviewed Haug and taken down statements of what he said. The substance of these was as follows. Haug, a Norwegian sailor, knew that he was required to register under the Selective Service Act, when it was passed on October 16, 1940; but he had not done so until August 24, 1942, because he had no intention of complying with the Act, and would not serve in the

United States Army under any circumstances; he registered only because, having lost his seaman's certificate, he supposed it necessary to do so in order to get a new certificate which would allow him to serve on an American ship. When he did register he gave as his address the Seamen's Church Institute, at 25 South Street, New York, where he lived at the time, and where he stayed for a week, after which he went to Brooklyn. On September 9, 1942, he sailed from New York, came back on January 20, 1943; stayed in New York for about a week at an address on 25th Street, near Eighth Avenue, and later at other addresses which he could not remember. Soon thereafter he went to Hoboken, where he got a job in a dry dock and lived at a boarding house on Williams Street in that city. On April 24, 1943, he shipped again on an American vessel and did not come back until December 30th. Thereafter he stayed at rooming houses or hotels in New York. He had however, gone to the Seamen's Institute twice in September, 1942, and once he had inquired for his mail; if he had received any notices from the local board, he would have paid no attention to them. He went to the Institute to check his baggage on January 25, 1943, but at that time he did not inquire for any mail.

When Haug appeared before his board on August 24, 1942, and registered, he received a registration certificate signed by him in his correct name, but containing on the body of it, as his name: "Ivar Heuj." At that time the Board issued, and kept on its files, a green registration card containing his name, "Iver Heuj," his address, "25 South Street, New York City," the place and time of his birth, and certain other details. This card also he signed correctly: "Ivar Haug." On October 16, 1942, the local board sent a questionnaire addressed to "Mr. Ivar Hang, 25 South Street, New York City," which was returned unclaimed on April 19, 1943. On April 13, 1943, it sent him a "notice of delinquency," addressed to "Iver Heuj, 25 South Street, New York City," which was returned on October 12, 1943. On December 29, 1943, it sent him a post card, classifying him as "I-A," addressed to "Mr. Ivar Haug (alias Iver Heuj), 25 South Street, New York City," which was returned unclaimed on April 3, 1944. Finally, on January 7, 1944, it sent him an "order to report for induction," addressed to "Iver Heuj, 25 South Street, New York City," which was re-

turned at the same time as the notice of classification. He was taken into custody shortly before January 17, 1944, and the indictment was filed on April 24.

Haug put in evidence showing that mail sent to the Seamen's Church Institute, and addressed to "Ivar Hang," or "Iver Heuj," would be put in a different pigeon-hole from that addressed to "Ivar Haug"; and that if he had called for such mail, it would not have been delivered to him. He also proved that, beginning with June 1940, he had been in this country only between the following dates: October 1, 1940, to November 15, 1940; about December 15, 1941, till the end of that month (during which time, however, he had lived on the boat); March 20, 1942, to June 1, 1942; June 11, 1942, to September 15, 1942; January 27, 1943, to April 24, 1943; December 29, 1943 until he was arrested, about January 17, 1944. (The foregoing is not quite accurate in that he reached New York some time before March 20, 1942, but lived on the boat until that date: also in that he left Newport News upon a ship early in July, 1942 and did not get back until late in August of that year.) At no time had he been ashore in this country for ninety days on end. We reserve consideration of the judge's charge, because that will come up more properly, when we come to consider whether the conviction under the first count can stand.

Haug raises three points upon this appeal: (1) That he was exempt from the Act; (2) that he did keep his local board advised of an address where mail would reach him; (3) that the notice which the board posted to him did not impose upon him any duty to execute and return the questionnaire sent to him. Section 302 of Title 50—War Appendix, makes it "the duty of every male citizen * * * and of every other male person residing in the United States * * * to present himself for and submit to registration." Congress had power to draft all persons "residing" within the borders of the United States, and Haug does not dispute that the definition of "residence" in the Regulations was valid. On August 24, 1942, the relevant regulation —§ 611.13(a)—provided that "a male alien who is now in or hereafter enters the United States, who has not declared his intention to become a citizen of the United States, is not * * * within section 2 or section 3 * * * (6) if he has entered, or hereafter enters, * * * and does not remain in the United States * * * for

more than 3 months following the date of his entry." Subdivision (b) provided that such an alien, who "hereafter enters * * * and remains * * * for more than 3 months following the date of his entry" was subject to the Act unless he filed "an Alien's Application for Determination of Residence." Section 611.21 at that time provided that an alien who entered after February 16, 1942—as Haug had done—and who wished to procure such a "determination" might file with his local board an application for it within three months after his entrance, whether he had registered or not. From this it appears that the exemption was not automatic, but that the local board must determine it, upon an application, which might precede, or follow, registration. When Haug registered on August 24, 1942, he did not therefore lose his privilege of exemption, but he was not automatically exempt as a "non-declarant alien"; and he lost his privilege three months after his entry. He never did apply for a "determination" until after January 17, 1944, and although § 611.13 was twice amended before then (on September 14, 1942, and July 8, 1943), neither amendment gave him an automatic exemption. There was thus nothing to submit to the jury upon this issue, and much of the discussion and most of the requests to charge were irrelevant.

■ It does not however follow, because Haug was not exempt, that he was guilty upon either of the counts of the indictment. Section 311 of the Act makes it a crime to "neglect to perform any duty required" by the regulations, when the accused fails to do so "knowingly"; and it would not have been a crime for Haug to fail to fill out and return the questionnaire, even if it had been properly addressed, if it had never reached him. Section 621.2 of the regulations must be read in supposed consonance with this condition. The prosecution argued, and the judge apparently agreed, that, although Haug never received the questionnaire, he was to be charged as though he had, because of his intent, manifested by his declarations to Hallett, not to comply with any of his duties as a registrant. We should agree that a registrant who refused to call for his mail at the address which he had given, knowing that the local board might have mailed a notice to him at that address, "knowingly" neglected to obey any duties which the notice would have imposed upon him, if he had in fact received

it. Nevertheless, such an intent was not alone enough to charge him with the offense of failing to "return" his questionnaire, as required by § 621.2 of the regulations. That duty arose only at the end of "10 days after the date on which it" (the questionnaire) had been "mailed to him"; and "mailed," as there used, meant that the notice had been addressed to the place of which he had kept the board "advised". The board did not send the questionnaire to that address; for, although it did send it to the Institute, it was directed to "Hang," and would not have been delivered to him, had he inquired for it. Assuming—which was not proved—that he knew that a questionnaire would be sent to him, and that he meant to disregard all orders of the board—which was proved—he could not be convicted of failing to fill out and return the questionnaire. Mailing was a condition upon that duty, and a defiant attitude in general to all his duties, however culpable morally, was not a crime in itself, even though we assume that it would supply that "knowledge" which was one element. Hence the prosecution failed to prove the second count, and it should have been dismissed.

The first count raises more difficult questions. As we have said, it alleged that from the time when he registered until he was arrested, Haug did not keep his local board advised of the address where mail would reach him, as required by § 641.3. When, on August 24, 1942, he gave the Institute as his address, he was living there; mail directed to him under the name he gave would have reached him, had he called for it; and there was no evidence to support a verdict that he did not at that time mean to call for it. Indeed, he did actually call for mail at least once in September, 1942, before he left New York on September 15, not to return until January 27, 1943. The fact that, had he gone to the Institute and received a notice to return the questionnaire, or to perform any of his other duties, he would have disregarded it, was irrelevant to the charge that he did not give an address at which mail would reach him. That duty comprised no more than reasonably to insure the receipt by him of his mail; and the judge should have dismissed the first count as well as the second, if the offence had been limited to August 24, 1942. However, it was not. Section 641.3 requires a registrant to give to his board, not only the address at which mail will reach him when he registers, but to "keep" the

board "advised" at all times of such an address. Literally, Haug did not fail in that duty either, because the Institute was an address where mail would reach him if he chose to call for it; it was far more likely to be kept for him there than at any of the other places at which from time to time he casually sojourned in his wandering sailor's life. Bartchy v. United States, 319 U.S. 484, 63 S.Ct. 1206, 87 L.Ed. 1534. Indeed, the Institute appears to have held for him both the questionnaire and the "notice of delinquency" for a period of six months. His offence, if he committed one, was therefore in his change of purpose some time after September, 1942: that is, in deciding no longer to call for any mail which might be awaiting him at the Institute.

■ There was evidence in the case from which a jury might have found that at some time after September, 1942, he did mean no longer to call at the Institute for any mail that might be waiting for him; and if it was a part of the duty imposed by § 641.3 that the address, of which the registrant should "advise" his board, should be one at which he meant to call for mail at reasonable intervals, the jury might have found him guilty upon the first count. Plainly, such an intent must be implied; the purpose of the regulation was to give notice to the registrant; and, if he did not mean to call for his mail, it was as idle to give the board an address where it would reach him, if he did call, as it would be to give one where it would not reach him, whatever he did. Therefore, the judge was right in not dismissing the first count. The only remaining question is therefore whether the existence of that intent was properly left to the jury.

The following is an abstract of all that can be gathered from the record on that subject. After reading the indictment the judge said that the Act made it a crime knowingly to fail in any duty required by it or by the regulations; and thereupon he quoted § 641.3 at large. He then mentioned generally the duty to return a questionnaire; which he followed by saying: "There is also an affirmative duty * * * to discharge those duties that are imposed upon him by law, * * * he cannot merely sit back and say that he has not received a communication." He then summed up the testimony, saying correctly that Hallett's that Haug had told him "that he knew at all times that he was required to keep in contact and in touch with the local

board, that he realized that he had duties to perform under the Selective Service Act, and that he had no intention whatever of complying with those duties." Thereafter he discussed the issue of residence and nonresidence, which he in effect withdrew from the jury—properly as we have seen—and he ended with those remarks about reasonable doubt and the like, which it is customary and proper to include. Thereupon ensued a long colloquy between the judge and Haug's attorney, in part based upon thirty-six requests to charge, of which the judge rightly refused all those concerning residence—fifteen in all. Of the other twenty-one, eleven concerned the second count only, and of the rest only numbers eight, twenty and thirty could on any theory be thought relevant to the first count. The judge charged number thirty; and, although he may be considered to have refused numbers eight and twenty, they were not important. However, at one point in the colloquy with Haug's attorney, when asked to instruct the jury specifically about some of the regulations, the judge said that if the jury believed Hallett's account of what Haug had delared to him, "many of these things probably would be covered by the general question whether he did knowingly and unlawfully fail and neglect to comply with his duties." Soon after the jury went out, they came back and asked whether, if Haug had not received his questionnaire, it was his duty to inquire of the local board. The judge did not answer this categorically; but he did say: "You have here the testimony of Hallett, and you have the other evidence in the case and it is a question of whether he did knowingly fail to perform his duties." And later, after some further interchange: "I still say there was an affirmative duty on his part to do something, and then you have Hallett's testimony as to whether he knew there was such an affirmative duty and that he deliberately evaded it."

■ We have stated these proceedings at length because, while no relevant exception was taken, from an examination of the charge as a whole and of what followed, it appears, not only that the judge at no place told the jury that the issue upon the first count was whether Haug had changed his mind about calling for his mail at the Institute; but that he repeatedly indicated that, if he meant to disobey all orders of the board, that alone might be enough to convict him. As we have said, a purpose to disregard all

orders of the board was, toto coelo, different from a purpose not to call for his mail, and to make the first an equivalent of the second was to substitute as the offence, conduct which the statute did not condemn. This distinction went to the very essence of the crime, and we cannot treat its disregard as harmless error, even though the point was not made at the time. United States v. Trypuc, 2 Cir., 136 F.2d 900; Rule 10 of this court.

The conviction upon both counts will be reversed, and the second count will be dismissed. The first count will be remanded for a new trial in accordance with the foregoing. If, as we understand, Haug has been in custody since sentence, it may well be thought that justice does not demand another trial. Surely he was not among those, who by birth or adoption can be said morally to owe allegiance to the United States, however he may have been enmeshed in the coils of its law.

Judgment reversed.