IRISH v. CENTRAL VERMONT RY., Inc.
No. 46, Docket 20642.

Circuit Court of Appeals, Second Circuit.
Dec. 9, 1947.

Frederick W. Wakefield, Jr., of Burlington, Vt., for plaintiff-appellant.

H. H. Powers, of Rutland, Vt., for defendant-appellee.

Before SWAN, CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

This appeal is from a judgment of the District Court for the District of Vermont in a suit under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., by one of the defendant's employees to recover damages for personal injuries. The defendant answered the complaint by denying liability and pleading a general release. Issue was joined and the case went to trial by jury. At the close of all the evidence the court, relying upon Vermont law, granted the defendant's motion to dismiss the complaint on the ground that the release barred the suit and entered a final judgment for the defendant. Thereafter the plaintiff died and the duly appointed administratrix of his estate was substituted as a party. She has taken this appeal.

Federal jurisdiction is clear and unquestioned and the only issue before us is whether the court erred in holding as a matter of law that the general release barred the suit. The execution and delivery of the release was admitted but the plaintiff sought to

avoid it on the ground that he had been fraudulently induced to sign it by a claim agent of the defendant.

The plaintiff was a car inspector at work for the defendant in its freight yard at Burlington, Vermont, when he fell from a car which ran over his left foot and injured it so severely that his leg had to be amputated seven inches below the knee. He testified that about four days after he was hurt and while he was still in a hospital at Burlington the defendant's claim agent and its chief car inspector came to see him and he told them how the accident happened. Soon after he was discharged from the hospital the claim agent called at his home in Burlington, at which time they discussed a settlement. The upshot of that conversation was that the agent offered to pay $1500.00 but the plaintiff refused to accept that sum, saying, "it ought to be worth $5000.00 anyway." The agent replied that he couldn't pay so much. A few days later the claim agent returned to the plaintiff's home and the plaintiff's testimony as to what then occurred is as follows:

"A. Well he came down with a release and a check of 1500, and if I was—if I accepted the check of 1500 he would see that I would get more money. If I would go to court with it he said it might drag on two or three years and I probably wouldn't get anything. So in my condition, I hadn't worked or nothing coming in, I signed the release.

"Q. Did he say anything to you—did he promise you anything? A. He promised me he would see that I would get my pension retirement.

"Q. He promised he would see you got more money? A. Yes, sir.

"Q. And he would get your pension for you? A. He would try to get the pension.

"Q. And as a result you signed the release? A. I did.

"Q. And you signed the voucher—I mean the check? A. Yes.

\*     \*     \*     \*     \*     \*

"Q. Did he promise you anything about work at that time? A. No, sir."

He executed the release on October 24, 1944. It was general in form and specific in reference to the injury and consequent amputation of his leg. The stated consideration to him was "Payment of Hospital-Doctor Accounts, plus payment of $1,500.-00.—the Railway to furnish an artificial foot agreeable to Dr. Truax and injured employee." This consideration was paid to the plaintiff and there was no proof that he thereafter demanded anything more or that all or any part of the consideration was ever returned or tendered to the defendant before or after this suit was brought on July 25, 1945.

Sometime after that date the plaintiff went to St. Albans, Vermont, on his own initiative, to see the claim agent who told him he "would try to get the pension or get me a job." He was offered a job as a call boy at St. Albans on condition that he would discontinue his suit. He refused to accept the job offer, however, because he thought it would have been too expensive to live away from his family in Burlington. He asked for a job at Burlington but none was available there for him. After returning to Burlington he was advised to drop his suit by a friend who was in no way connected with the railroad. The friend wrote and brought to the plaintiff two letters—one addressed to the plaintiff's attorney and one to the defendant's claim agent—which the plaintiff read and then signed and mailed. The one to the attorney advised him that the plaintiff had decided not to press the suit and told him to "consider our business relations at an end upon receipt of this letter." That to the claim agent read as follows:

"I have served notice on Attorney FW Wakefield here that business relations between him and me have come to an end. I was unduly influenced with regards to the lawsuit against the CV. I shall have no part or parcel of it.

"I have been thinking back of late quite a bit and I have reached several conclusions. My employment relations with the CV have always been fair and the treatment that has been accorded me has been just, so far as I am personally concerned. The CV has been most reasonable in the settlement of my most unfortunate accident, for they not only made a cash settlement but also

paid for the hospital, doctor and have provided me with a very good artificial limb. I am very pleased over this.

"I believe now that I am in a position to discuss with you my future status as an employee of the CV. I believe that I am now able to return to work for the CV, perhaps not in the same category as before the accident. As I remember it there was some conversation on this matter and that when I felt able to return that we would hold further discussion.

"I am now in a position to discuss this matter further with you and trust that you will see your way clear to call upon me at an early date. I would like to discuss things with you or another official of the CV before too many days have passed by.

"I look forward to your early reply."

He waited "for some time" and then went to St. Albans again and saw the claim agent but obtained no position with the railroad. He learned, however, that the pension they had talked about could not be granted by the railroad but only by the Railroad Retirement Board and that his disability was not such as to make him eligible for a pension under the federal law. 45 U.S.C.A. § 228a et seq. It was after this had taken place that the suit was brought on for trial.

The appellant seeks a reversal of the judgment on the ground that it was error not to submit to the jury the question of fraud in obtaining the release. The appellee seeks to support the judgment on what may be treated as two grounds, (1) that the evidence of fraud was insufficient to present a question of fact for the jury and (2) that the failure of the plaintiff to prove a restoration, or a tender of restoration, of the consideration he received foreclosed his right to show that the release had been fraudulently obtained.

■ As to the sufficiency of the evidence to show fraud the law of Vermont is not decisive. We have recently decided that federal law controls in a suit under this federal statute as to the validity of a release pleaded and proved in bar of the action. Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757, 164 A.L.R. 387; accord, Thompson v. Camp, 6 Cir., 163 F.2d 396, 400. Cf. Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239. So it is immaterial that the motion to dismiss the complaint may have been decided correctly under local law,[1] for the reason that proof of the representation that an attempt would be made to get the plaintiff a pension was insufficient evidence of fraud because merely promissory of future action.

■ The federal rule is more liberal. If the promise to try to get the plaintiff a pension was made and was a part of the inducement to him to execute the release, it may have been a false representation of a material fact, viz., that the claim agent intended to perform his promise. Philadelphia Storage Battery Co. v. Kelley-How-Thomson Co., 8 Cir., 64 F.2d 834, certiorari denied, 290 U.S. 651, 54 S.Ct. 68, 78 L.Ed. 564; Howard v. Howe, 7 Cir., 61 F.2d 577, certiorari denied, 289 U.S. 731, 53 S.Ct. 527, 77 L.Ed. 1480; Rogers v. Virginia-Carolina Chemical Company, 3 Cir., 149 F. 1. If the jury believed the evidence of the plaintiff, it could have found that the claim agent made the promise. It needed no more than belief in the truthfulness of the plaintiff's testimony to find that he reasonably understood, and that the claim agent knew he understood, that the agent was going to try to persuade the railroad to grant him a pension. Since, as the appellee itself correctly pointed out during the trial, it is the Railroad Retirement Board which has the sole power under the applicable law to grant such pensions, the jury might have inferred that the claim agent knew that and also knew that the plaintiff's disability did not make him eligible for a pension. It would then follow practically as a matter of course that the claim agent knew that he was inducing the plaintiff to agree not to sue the railroad by creating false hopes. The letter the plaintiff wrote the claim agent when later trying to obtain a job does contain admissions of fair treatment leading up to a satisfactory settlement, admissions which tend to negative fraud or to show a ratification of the agreement at the time they were

---

[1] See Girard v. Jerry, 95 Vt. 129, 113 A. 533; Brown v. Fine, 104 Vt. 221, 158 A. 669; and Woods v. Scott, 107 Vt. 249, 178 A. 886.

made. Such questions of fact were for the jury,[2] provided the plaintiff was free to raise them without restitution or tender of the consideration he received for his promise. We shall now turn to that point.

Ordinarily it is true that one may not keep the fruits of his contract and at the same time repudiate it on the ground that he was fraudulently induced to make it. Grymes v. Sanders, 93 U.S. 55, 23 L.Ed. 798; Singer v. Friedman, 66 App.D.C. 191, 85 F.2d 690, certiorari denied, 299 U.S. 590, 57 S.Ct. 116, 81 L.Ed. 435. But the question here is not when, in general, making restitution is a condition precedent to setting a contract aside for fraud, but the narrower one whether a contract not to sue on a claim within the coverage of the Federal Employers' Liability Act may, by virtue of Sec. 5 of that Act, 45 U.S.C.A. § 55, be repudiated for fraud without a tender of the consideration received.

The pertinent part of that section reads: "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by the Act, shall to that extent be void: * * *." In Duncan v. Thompson, 315 U.S. 1, 62 S.Ct. 422, 86 L.Ed. 575, the breadth of this section was recognized. An injured employee had been made an advance for living expenses pending a determination of the extent of his injuries and in consideration had agreed to sue only after an effort to settle in good faith had been made and failed and the advance had been returned. He nevertheless brought suit under the Act without making restitution. It was held that this failure was no defense to the suit since the contract was void under Sec. 5. It is to be noted that the contract involved in that case was not a compromise and settlement of the claims but only a step looking toward a settlement in the future. The distinction between that case and this, of course, is that here the agreement not to sue was a part of what purported to be a full and complete compromise and settlement. But by hypothesis a bona fide compromise and settlement was not made, because the plaintiff's agreement was obtained by fraud. If he must as a condition precedent to maintaining suit return what he was deceived into taking, he is as effectively deprived of his right to sue except upon that condition as though he had expressly so agreed, as did the employee in the Duncan case, supra. If this be so, what cannot be done by a fair agreement would follow by implication of law as the result of a fraudulent one, provided only that the latter is couched in terms of full and complete compromise. We leave undecided the effect of Sec. 5 as to a bona fide compromise and settlement.[3] But we do hold that, if this release were obtained fraudulently by the appellee, it was within the broad scope of the phrase "any * * * device whatsoever," in Sec. 5 and consequently void. It follows that the plaintiff was free to attack its validity without restitution. Duncan v. Thompson, supra.

Judgment reversed and cause remanded for a new trial.

---

2 Ewing v. Burnet, 11 Pet. 41, 51, 9 L.Ed. 624. Whether facts alleged to constitute fraud exist, where as here their existence is disputed, is an issue for the jury, Ettelson v. Metropolitan Life Ins. Co., 3 Cir., 137 F.2d 62, certiorari denied, 320 U.S. 777, 64 S.Ct. 92, 88 L.Ed. 467; Fidelity & Casualty Co. v. Glenn, 4 Cir., 3 F.2d 913. See also Philadelphia Storage Battery Co. v. Kelley-How-Thomson Co., supra, 8 Cir., 64 F.2d 834, at page 839; 24 Am.Jur. Secs. 290–300; cf. 5 Williston on Contracts, Rev. Ed. 1937, Sec. 1603.

3 But see Bay State Dredging & Contracting Co. v. Porter, 1 Cir., 153 F.2d 827, 832; Mellon v. Goodyear, 277 U.S. 335, 48 S.Ct. 541, 72 L.Ed. 906 (Sec. 5 not discussed); and D. A. Schulte, Inc., v. Gangi, 328 U.S. 108, 113, 66 S.Ct. 925, 90 L.Ed. 1114, 167 A.L.R. 208.