UNITED STATES v. RUBINSTEIN et al.
No. 125, Docket 20802.

Circuit Court of Appeals, Second Circuit.
Feb. 5, 1948.

Writ of Certiorari Denied April 5, 1948.
See 68 S.Ct. 791.

CHASE, Circuit Judge, dissenting in part.

————◆————

Edwin B. Wolchok, of New York City, and Lemuel B. Schofield, of Philadelphia, Pa., for Serge M. Rubinstein, appellant.

George Wolf, of New York City, and Thomas D. McBride, of Philadelphia, Pa., for Allen Gordon Foster, appellant.

John F. X. McGohey, U. S. Atty., of New York City (Irving H. Saypol, Chief Asst. U. S. Atty., and Keith Brown and Bruno Schachner, Asst. U. S. Attys., all of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

Appellant Rubinstein was indicted by a grand jury in the Southern District of New York for five separate violations of Sec. 11 of the Selective Training and Service Act of 1940.[1] The relevant part of that statute reads as follows: "Any person who shall knowingly make, or be a party to the making of, any false statement or certificate as to the fitness or unfitness or liability or nonliability of himself or any other person for service under the provisions of this Act, or rules, regulations, or directions made pursuant thereto, * * * or any person or persons who shall * * * conspire to do so, shall, upon conviction in the district court of the United States having jurisdiction thereof, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment, * * *."

The first count in the indictment charged that Rubinstein made, in violation of the above statute, false statements to his local draft board as to his nonliability for service in support of an application on February 2, 1943 for re-classification from class I-A to class III-B, i. e., for a dependency deferment. The allegedly false statements were in effect that he had no assets from which he could support his dependents if he were inducted into the armed forces; that they would have to live on such allotments as the government made; and that he had exhausted his capital resources to pay his expenses, which in the years immediately preceding had exceeded his income.

The second count alleged that Rubinstein and Allen Gordon Foster, the other appellant, had on the same date, February 2, 1943, knowingly made, and were parties to the making, of false statements as to the former's nonliability for service under the provisions of the statute by submitting to his draft board an affidavit in which it was stated in substance that his "functions" were of such a character that the "successful continuance" of the operations of Panhandle Producing and Refining Co., Midway Victory Oil Co., and Panhandle Steel Products Co., depended upon his "remaining with" those companies; and that it would be impossible to replace him "without seriously impairing the drilling program and otherwise seriously hampering the activities of" those companies.

The third count charged that the two appellants and others unknown conspired to do the unlawful acts charged in the second count.

The fourth count alleged that appellant Rubinstein and one Hart, who was indicted and convicted but has not appealed, knowingly made, and were parties to the making, of false statements on or about October 12, 1943, as to the nonliability of Rubinstein for service under the provisions of the statute by submitting to his draft board on or about October 12, 1943 an affidavit falsely stating that he was executive assistant to the president of Taylorcraft Aviation Corporation; had been so employed on August 2, 1943; and was in charge of financial and administrative matters for that corporation.

The fifth count alleged that Rubinstein and Hart, and others unknown, conspired to do the unlawful acts charged in the fourth count.

Rubinstein and Foster were both convicted by a jury. The former was sentenced on each count to imprisonment of two and one-half years and to pay a fine of $10,000, the imprisonment sentences to run concurrently. The latter was sentenced on each count to imprisonment and fined $5000, the imprisonment sentences being suspended.

Each of the appellants attacks the judgment upon several grounds which will be stated as reached. Most apply to both but one only to Rubinstein as will be indicated. The following statement of the facts will suffice, for the record contains ample evi-

[1] 54 Stat. 894, 50 U.S.C.A.Appendix, § 311.

dence to take the case to the jury and to support the verdict.

Rubinstein was an active and successful business man engaged in financial operations of considerable magnitude with offices at No. 63 Wall St. in the City of New York. He was a national of Portugal residing in this country with his wife and had other dependents. He was within the age limits which made him, subject to the provisions of the Selective Training and Service Act, 50 U.S.C.A.Appendix, § 301 et seq., liable for military service in the armed forces of the United States and he had before February 2, 1943 complied with the statutory requirements. His original I-H classification was on March 3, 1942 changed to III-A, a dependency deferment. This classification was on November 25, 1942 changed to II-B, an occupational deferment. Thereafter his local draft board temporarily changed his classification to I-A and notified him to appear for hearing on February 2, 1943. He then appeared and submitted the affidavits containing the written statements both as to his dependents and as to his connection with the companies named in the second count which the jury justifiably found to have been knowingly false. The gist of his statements concerning dependents is in the following quotation from his affidavit: "Should I be inducted, none of the aforesaid persons, including my wife, her family, my mother and my aunt will receive any income from any source except such sums as they may receive from the United States Government. I have no assets from which I could otherwise provide for the support of those people." [2] He closed this affidavit with these words, "In view of my occupational and dependency status, I respectfully request that I be reclassified III-B." This was a request for a dependency deferment but when he appeared at the hearing on February 2, 1943 and submitted the affidavit he stated orally that he desired to be reclassified II-B, an occupational deferment, though he did not withdraw his written request for the III-B classification. He

also submitted Foster's false statement at this time in support of the request for an occupational deferment. As a result of this hearing he was reclassified II-B by his local board. On an appeal taken by the government to the Appeal Board he was on May 7, 1943 reclassified I-A. On June 10, 1943, he was advised that he would be inducted in July and asked to fill out form 304, which was the regular personal history statement required of an alien. He did so and therein informed the local board that proceedings had been commenced to deport him as an alien who had entered this country illegally. He made a fruitless appeal to the President to have his I-A classification changed, that classification being affirmed on September 7th, 1943. But on this same date, as it happened, his local board reclassified him II-B and the government again appealed. This appeal brought about a I-A classification for him on October 2, 1943 and he was ordered to report for induction on October 20th.

Apparently nothing daunted, Rubinstein then requested a rehearing which was granted by the local board and that hearing was set for October 12th. On this date he appeared and submitted a false affidavit showing his employment by the Taylorcraft Aviation Corporation on a selective service form known as 42A signed by defendant Hart. This affidavit falsely represented the time of his employment and the need of that corporation for his work on its behalf. His local board did not, however, change his classification from I-A but ordered him to report for induction on November 17, 1943. On November 16, 1943, he filed with his local board what is known as form 301 in which he requested exemption from service as a neutral alien. He had at all times been entitled to this exemption upon request made in accordance with the statute, United States v. Haug, 2 Cir., 150 F.2d 911, and it was granted him, the condition being, as the statute provided, that he could not thereafter become an American citizen.[3]

Both appellants insist that, even assum-

---

[2] At this time he had assets which were admittedly worth in excess of three hundred and seventy-six thousand dollars, though he claimed his liabilities were much greater, and his mother was being paid an annuity of $1500 a year by a Swedish insurance company.

[3] 50 U.S.C.A.Appendix, § 303(a).

ing arguendo that the statements they made were false, they committed no substantive offense and consequently no conspiracy was proved, because the statute covers only false statements as to fitness or unfitness and liability or nonliability for service. They say that their statements were made merely for purposes of obtaining "deferment" and thus not within the statute at all. They distinguish Kreibich v. United States, 8 Cir., 261 F. 168, holding that statements made to obtain a deferred classification were statements asserting nonliability for service, on the ground that the Selective Draft Act of 1917,[4] there construed, was different from the Act of 1940. And they are right to this extent: Under the 1917 Act liability for service was made dependent upon the action of the local draft boards in determining financial and physical condition and occupational status, while the 1940 Act made liability for service wholly dependent upon statutory provisions. It left draft boards without power to discharge a registrant from liability, giving them only the power to defer the induction date of those liable for service. But if the appellants are right as regards the construction they would have us give the 1940 Act, Congress left a loophole in it enabling registrants and those who aided them to make false statements with impunity in support of requests for a deferred classification.

■■■■ Though criminal statutes are to be construed strictly, that does not mean that the construction must be as narrow as possible. United States v. Giles, 300 U.S. 41, 48, 57 S.Ct. 340, 81 L.Ed. 493; United States v. Corbett, 215 U.S. 233, 242, 30 S.Ct. 81, 54 L.Ed. 173. As was said in United States v. Hartwell, 6 Wall. 385, 18 L.Ed. 830, "The rule [of strict construction of penal laws] does not exclude the application of common sense to the terms made use of in the Act, in order to avoid an absurdity which the Legislature ought not to be presumed to have intended." As there was nothing in any of the statements made which had to do with physical, mental, or moral fitness or unfitness, that part of the statute may readily be put aside.

The coverage, if any, is found in that part which deals with false statements made knowingly, regarding liability or nonliability. The general plan of the Act of 1940 was, as the appellants assert, to create by statute a class of registrants out of which classifications were to be made in the first instance by local draft boards in accordance with the statute and the rules and regulations duly promulgated thereunder. These registrants were, in large part at least, not permanently discharged from over-all liability for service but only given classifications which determined the order in which they would be inducted. The permanently unfit were in practical effect discharged, as of course was Rubinstein himself when finally classified as an exempt neutral alien. But we will assume, for present purposes, that the appellants are right in their premise that a deferment is not a discharge from the liability of a registrant for service and indeed that Congress recognized this distinction so far as certain parts of the Act, e. g., 50 U.S.C.A. Appendix, § 305, were concerned. Even so, deferment is plainly something which affects the time of the registrant's entry upon such service and, in the broader sense, his liability or nonliability for service at any given time was made dependent upon whether he did or did not have a deferred classification. There is no reason to believe that Congress used the words "liability or nonliability" in the criminal section of the Act only to refer to the over-all liability or nonliability of a registrant. These words may be construed to include the liability or the opposite of a registrant from time to time in accordance with his classification under the law. That is what, in our opinion, Congress clearly intended. Cf. United States v. Peskoe, 3 Cir., 157 F.2d 935, certiorari denied, 330 U.S. 824, 67 S.Ct. 865, rehearing denied, 330 U.S. 856, 67 S.Ct. 1080; United States v. Rooth, 2 Cir., 159 F.2d 659. This section of the statute follows the 1917 Act without significant verbal changes. Though the local boards could not exempt, but only defer, registrants under the 1940 Act, Lehr v. United States, 5 Cir., 139 F.2d 919, 921, 922; cf. United States ex rel. Aberasturi

[4] 40 Stat. 76, 50 U.S.C.A. § 226 note.

v. Cain, 2 Cir., 147 F.2d 449, deferment was no different from the selection for "partial military service" made under the 1917 Act. The Act of 1917 provided, as far as is presently relevant that: "The President is hereby authorized to exclude or discharge from said selective draft * * * or to draft for partial military service only from those liable to draft as in this Act provided, persons of the following classes," among which were those with dependents and in essential industries. 40 Stat. 78 § 4. The word "liability" as used in the penal section of the 1917 Act, Sec. 6, included, therefore, liability for "partial military service." Thus the appellants' argument really comes down to the clearly untenable position that because Congress used the word "deferment" in the new Act and not the phrase "partial military service" it changed the substance of the criminal section of the statute by thus changing the form of the statute as a whole. We think, however, Congress intended to punish the making of false statements to procure, or to aid another in procuring, deferment as statements made respecting nonliability for service and used language of substantially the same import to accomplish this purpose as it knew had been previously construed to do so in the Kreibich case, supra.

■ The argument that Rubinstein was not "residing in the United States" within the meaning of that phrase in Sec. 3(a) of the 1940 Act,[5] is also without merit. It is based on the fact that on April 13, 1943 he was arrested on a warrant of deportation for having entered the United States illegally and thereafter released on bail pending the termination of the deportation proceedings which have not even yet been completed so far as this record shows. But the mere charge still unproved, that he entered unlawfully did not make him a nonresident. 39 Op.Att'y Gen. 504 and Sec. 611.12 of the Selective Service Regulations indicate, moreover, that the words "residing in the United States" as used in the Act refer only to living or having a place of abode temporary or otherwise in the country.[6] Thus, even if Rubinstein were a nonresident under the immigration laws, as having entered illegally, Werblow v. United States, 2 Cir., 134 F.2d 791, he could still be "residing" here within the meaning of the Selective Training and Service Act. It is fundamental that the word "residence" may have different connotations in different statutes and situations. See Restatement, Conflict of Laws (1934), Sec. 9, comment (e). Even if it be assumed, however, that, as a nonresident alien, he was not subject to the Selective Training and Service Act of 1940, he had in fact made false statements as to his proper classification, statements which were, as we have now held, as to his liability or nonliability for service. The making of these statements constituted a crime and it is immaterial whether the local board could have required him to make any statements at all. United States v. Kapp, 302 U.S. 214, 217, 218, 58 S.Ct. 182, 82 L.Ed. 205; Kay v. United States, 303 U.S. 1, 6, 7, 58 S.Ct. 468, 82 L.Ed. 607; United States v. Meyer, 2 Cir., 140 F.2d 652, 655; United States v. Barra, 2 Cir., 149 F.2d 489, 490. Consequently requests to charge to the effect that Rubinstein's residence in the United States was a controversial issue were properly denied.

■ What has just been said in effect disposes also of the contention that because Rubinstein was a neutral alien who could have at any time, and finally did as a last resort, obtain exemption from service on that ground, his false statements, and those of others, made while he was seeking a deferred status as a registrant were not within the statute. He was subject to service

---

[5] This section as amended, provided that " * * * every male citizen of the United States, and every other male person residing in the United States, who is between the ages of eighteen and forty-five at the time fixed for his registration, shall be liable for training and service in the land or naval forces of the United States * * *." 50 U.S.C.A. Appendix, § 303(a).

[6] Sec. 611.11 of the Selective Service Regulations provides that: "Every male alien who has declared his intention to become a citizen of the United States" is residing within the United States within the meaning of the Act. Rubinstein told his draft board that he had filed his declaration of intention to become an American citizen.

until or unless he requested the exemption and while he was a registrant liable for service, statements made as to his non-liability may be treated no differently from like statements respecting the same subject as to any other registrant. Cf. United States v. Peskoe, supra, 157 F.2d at page 938.

■ It is also contended that the statements made in support of his requests for occupational deferment were not false within the statutory meaning because they were, and of necessity had to be, but expressions of opinion as to the need of his employers for his services and as to their inability to replace him without disrupting the·war work in which they were engaged. The statements, however, seem to have related to his employment and his employers' need for his services as of the time they were made and thus appear to be statements of present facts so far as those facts were definitely ascertainable. But we are not content to rest our decision here. Even if these statements were but expressions of opinion, pertaining to future matters only, the making of them implied that the makers believed them to be true. If this belief were not honestly entertained, therefore, the statements contained a misrepresentation of present fact. Cf. United States v. Comyns, 248 U.S. 349, 39 S.Ct. 98, 63 L.Ed. 287; Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709; United States v. Uram, 2 Cir., 148 F.2d 187; United States v. Rowe, 2 Cir., 56 F.2d 747; certiorari denied, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289; Van Riper v. United States, 2 Cir., 13 F.2d 961, certiorari denied sub nom. Ackerson v. United States, 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848; Knickerbocker Merchandising Co. v. United States, 2 Cir., 13 F.2d 544; certiorari denied, 273 U.S. 729, 47 S.Ct. 239, 71 L.Ed. 862; see also Irish v. Central Vermont Ry., 2 Cir., 164 F.2d 837, and cases therein cited. The statements were to be used to enable men to be selected for the armed forces with due regard for the needs of their dependents, their employers, and the public. The makers were not subject to criminal liability unless the statements were made willfully, i. e., unless they were made intentionally, or unless the statements were "knowingly" false. We think that for a statement to have been knowingly false within this statute, it is sufficient that its maker did not honestly believe it to be true. The object was to prevent the making of classifications which were not in accordance with the law. The way in which this object was sought to be attained was to make it a crime if statements furnished to the draft boards, whether purporting to concern present facts or matters of opinion only, or whether pertaining to the past, present or future, were not believed true by those who made them. Owing to the very magnitude of the draft boards' task, it was generally impossible for them to make a thorough and independent investigation of the facts. Without the requirement that we now hold the statute imposed, administration of the Act would have been overly difficult and unduly burdensome. In this view of the statute the charge of the trial court was correct [7] and the judgment on the verdict unassailable upon this ground. To the extent that Chaplin v. United States, 81 U.S. App.D.C. 80, 157 F.2d 697, 168 A.L.R. 828, may be in conflict herewith, we decline to follow it.

■ The attack upon the conspiracy counts is twofold. As to the argument that neither conspiracy was criminal because it concerned acts which if done were not substantive offenses no more need be said. But it has been contended that the convictions on the conspiracy counts must be reversed on the authority of our decision in United States v. Zeuli, 2 Cir., 137 F.2d 845. We there held that, where the concert of two or more persons is necessary to commit the substantive crime, an agreement to

---

[7] The charge, so far as is now pertinent, read: "A man knowingly makes a false statement when he represents as true that which at the time he knows to be untrue as to a material fact." While the trial court did not specifically charge the jury that if it found the statements not to have been honestly entertained, they were "knowingly" false within the statute, the defendants interposed no objection on this score. Though they did request the court to define "false statement," their proposed definition went only to the point that if the statements were but expressions of opinion, they were not "false" within the Act.

commit that crime is not punishable separately as a conspiracy. But that decision is by no means applicable here. It is self evident that either of the appellants could have made the false statements they did make without the connivance of the other or of anyone else. The statute is phrased in the alternative; it concerns "Any person who shall knowingly make, or be a party to the making of, any false statement * * *" It is immaterial that the indictment charged the defendants with making and being parties to the making of the statements.

■ On a par with the last mentioned point is another which needs only slight notice. Although it was not charged in the indictment that the statements were false in respect to the amount of war work being done by the various corporations concerned, evidence to show that they were false in that respect, and possibly in others, was introduced by the prosecution. As the intent or state of mind of the appellants was in issue, such evidence was admissible for the purposes of showing that intent. United States v. Shurtleff, 2 Cir., 43 F.2d 944.[8]

The judgment and sentence on the first count is further attacked by Rubinstein alone. To the extent that he seeks reversal upon the ground that his statement was not false he is overwhelmed by the evidence. His contention is based upon evidence tending to show that despite his large assets he had liabilities which made him insolvent from a balance sheet standpoint. The answer to this is that the jury certainly did not have to take his evidence, which was at best equivocal, at its face value. The liabilities relied on to show insolvency were mainly future and contingent. As to them the protection afforded by the Soldiers' and Sailors' Civil Relief Act of 1940, 54 Stat. 1178, 50 U.S.C.A. Appendix, § 501 et seq., would have insulated his dependents from want. A balance sheet moreover—particularly one like that here relied upon, loaded as it was with contingent liabilities—gives little, if any, reliable indication as to one's ability to meet his current obligations. The distinction is well established, both in the law and in accounting, between insolvency in the bankruptcy, and insolvency in the equity, sense, and it is obvious that, in the final analysis, one's ability to support his dependents is determined by his ability to meet his current obligations, not, as Rubinstein would have had the draft board and would have us believe, by his net worth as of any given time.

Finally this appellant contends that the statements he made as to his inability to support his dependents if he were inducted were immaterial because he stated orally at the hearing on February 2, 1943 that he wanted to be put in class II-B, i. e., to obtain an occupational deferment. The record does show that he then stated to the local board that "he requested to be placed back in 2-B" and there is no evidence other than his affidavit in support of a III-B classification and his written request for one at the end of that document to show that he was then seeking one. My brothers do not believe that, in the light of his request for classification in II-B, the evidence was sufficient to support his conviction on the first count and, therefore, the judgment on that count must be reversed for the reasons stated in the opinion of Judge HAND.

I cannot agree, however, and would affirm as to count one because I think the affidavit was itself a continuing application for deferment in class III-B, which the jury was justified in so treating, notwithstanding what he said about a class II-B deferment. The situation, as I read the record, and the legal consequences were as follows:

He did not withdraw his written request for classification in III-B, a dependency deferment, and that remained on file with the local board together with the false statements which, if believed, might have induced it to give him that classification if classification II-B were denied. He merely expressed his preference for a II-B classification. His affidavit left before the board evidence on which it was bound to act in

---

[8] There was no request so to limit this evidence, though the appellants made 129 separate requests to charge. By sheer weight of numbers this was itself an imposition upon the court.

the event that it did not grant him the II-B classification. Sec. 11 of the 1940 Act imposes criminal penalties upon any "person charged as herein provided with the duty of carrying out any of the provisions of this Act, or the rules or regulations made or directions given thereunder, who shall knowingly fail or neglect to perform such duty, * * * or be a party to the making, of any * * * improper, or incorrect * * * classification * * *". The members of the local board were persons charged with the duty of carrying out the provisions of the Act. That required the consideration of all evidence this appellant placed before them which was relevant to the subject of his proper classification. The board was not relieved of its duty to give the applicant for deferment such a classification by his expression of preference for another. What was proper was one to which he was entitled under the law upon the facts presented and accepted as correct. He could not lawfully be denied all deferment, if his request for a II-B classification were refused, until the statements he had presented in support of any other deferred classification had been duly considered. So long as he left his affidavit on file it seems to me that it was for the jury to determine upon all the evidence whether he made the statements it contained to influence the action of the local board in passing upon his right to deferment.

The judgment on the second, third,

fourth and fifth counts is affirmed. The judgment on the first count is reversed.

L. HAND, Circuit Judge (concurring).

 Judge SWAN and I concur except that we think that the evidence did not support the verdict on the first count. The indictment alleged that Rubinstein submitted his affidavit of February 2, 1943, "in support of his request for reclassification from classification IA to classification 3B"; but we can find no testimony that he did so. The only part of the record which the prosecution says proved it, we quote in the margin,[1] and it does not show that he used the affidavit "in support of" any request whatever. Nor was this defect merely a variance between the indictment and the proof; for no crime at all was committed, so far as concerned that part of his affidavit. It is true that part of the language of the statute[2] is: "knowingly make * * * any false statement * * * as to the * * * nonliability of himself * * * for service"; but that does not include a statement on which the registrant, at the very moment of filing it, declares that he does not mean to rely; and we think it not an unfair paraphrase of the testimony that Rubinstein said to the board: "Don't pay any attention to what I have said about the dependency of other people upon me; I am not relying upon that part of my affidavit."

 A local board, even though presented with evidence that a registrant was

---

[1] "Q. Is that the time when he handed up these documents in evidence, from No. 15 to 15-I? A. Yes.

"Q. What did Mr. Rubinstein say when he handed up these documents?
* * * * *

"Q. What happened; what did Mr. Rubinstein say? A. He stated that he received a notice of reclassification from Class 2-B to Class 1, and he requested to be placed back in 2-B. He advised that he was president of three companies entirely devoted to the war effort, he owned no stock in these companies, and was paid a salary of $1,300 per month plus bonus; in the past six months he received a bonus of $6,000.
* * * * *

"Q. Didn't he say in words or in substance to the board that evening that

what he was there for that night was to ask for classification or continuance of classification in 2-B? A. That is correct.

"Q. Not 3-A*; right? A. As I recall it, yes.

"Q. So obviously that did differ from the written paper; correct? A. Yes.

"Q. And his request thus made to the board for that 2-B classification involved a consideration of nothing in respect of assets or dependents, did it not? A. Yes.

"Q. By your answer, Yes, you mean that that involved consideration of occupational deferment matters alone? A. That is correct."

* By this the witness meant 3-B.

[2] § 311, Title 50 U.S.C.A. War Appendix.

entitled to deferment, was not legally bound to defer him, if he made no claim for deferment. No public interest was served in deferring registrants who did not ask to be deferred. Conceivably Congress might have thought that it was necessary to the success of the war to protect those in whose interests deferment was possible; and had that been enacted deferment would not have been a personal privilege but a kind of duty. There is not the least ground so to construe the statute: the law expected all to serve who were fit and did not claim deferment. The boards were unfitted on their own initiative to learn whether registrants who were willing to serve, ought not to be allowed to do so. Deferment being a privilege like any other personal privilege, its holder abandoned it by failing to assert it; and, although in the case at bar Rubinstein might indeed have been laying a false foundation for a future claim, he was not indicted for doing so, and the foundation could not become a crime unless later he built upon it the necessary superstructure by an attempt to use it.